# Louisville & Nashville Railroad Co. v. Quick.

125  553
134  254
125  553
e142 141
125  553
144  214

*Action against Railroad Company to recover Damages for Personal Injuries.*

1. *Action for negligence; negligence alleged must be direct cause of injuries complained of.*—In an action against a railroad company to recover damages for personal injuries alleged to have been sustained by reason of the negligence of the defendant or its employes, in order for the plaintiff to recover, it

[Louisville & Nashville Railroad Co. v. Quick.]

·must be proved that the negligence alleged was the direct or proximate cause of the injuries complained of; and if the injuries resulted only through or by means of some intervening cause, from which said injury followed as a direct and immediate consequence, the damage will be referred to the last proximate cause, and not to the alleged negligence of the defendant, thereby defeating plaintiff's right of recovery.

2. *Same; sufficiency of plea; when portion of plea properly stricken.*—In an action against a railroad company to recover damages for personal injuries alleged to have been sustained by reason of the negligence of the defendant or its employes, where in the complaint there are facts averred, as cause of plaintiff's damage, which constitute independent causes of injury and which do not, according to the ordinary course of events follow from the wrong complained of, and were not so conjoined with the other facts as to support the action, such averments, setting forth an independent cause of injury, should be stricken from the complaint upon proper motion made by the defendant.

3. *Same; admissibility of evidence.*—In an action against a railroad company by a passenger to recover damages for being wrongfully carried beyond his place of destination, if it is shown that the plaintiff was carried beyond his place of destination by no fault of his own, but by the failure of the company's agent to perform his duty in the particular case, the company is liable in damages; and in such case whatever delay, deprivation, vexation, anxiety and suffering of mind plaintiff experienced and which were consequent upon such wrongful acts on the part of defendant's agents, and any harm or injury occasioned to the health of the plaintiff in returning to the point of destination, all should be properly considered as elements of recoverable damages; but what happened to the plaintiff after arriving at the point of destination is foreign to any issue in the case, and the facts and testimony relating thereto are inadmissible.

APPEAL from the City Court of Birmingham.

Tried before the Hon. W. W. WILKERSON.

This action was brought by the appellee, Malinda Quick, against the Louisville & Nashville Railroad Company, to recover damages for defendant's carrying her beyond her place of destination. The complaint contained two counts. In the first count it was averred that the plaintiff, who was very old and infirm and not accustomed to travel on railroad trains, and was not

familiar with the way in which passengers were informed about disembarking from trains on railroads, took passage on one of the defendant's trains, with a ticket for Birmingham as her place of destination; that she told the conductor in charge of the train that she wished to get off at Birmingham and informed said conductor that she was old and infirm and not acquainted with the ways of travel on railroad trains; that said conductor told her to remain on the car in which she was riding, and that on its arrival at Birmingham he would inform her of the fact and assist her to alight from the train; that upon the train arriving at Birmingham, the conductor wholly failed to inform her that she had reached her place of destination, and that she did not know until after her train had left Birmingham that that was the place where she wished to get off; that after being carried past Birmingham she was put off of said train at Warrior, a station on the line of the defendant's road, and in obedience to directions she waited there until the train going south to Birmingham reached said station, and then took passage upon said train; that upon being informed by a passenger that she was at Birmingham, she disembarked from said train. The first count then continued in its averments as follows: "In the meantime, her son, who had met the train upon which she had first come to Birmingham, not seeing her in the depot or alight from said train, had returned home. She did not know where her son lived, and after remaining in the depot at Birmingham for quite a while, she was put into a hack or other vehicle by a stranger and the driver told to carry her until she could find her son's home. The weather was exceedingly cold and wet, and she was driven a long distance and wandered from place to place in the city of Birmingham and never reached her son's home until about dark. In going to his house, she became thoroughly drenched with rain. After she found that she had left Birmingham, she was very much frightened and was very anxious and suffered a great deal of mental worry and anxiety and continued to suffer from anxiety and worry until she reached the home of her said son. On account of her

exposure to the cold and rain she was made sick and contracted rheumatism and other ailments, from which she has continued to suffer up to this time. She has had to spend money in attempting to affect a cure of her ailments and suffered a great deal of pain and anxiety, and has been permanently diseased because of the facts aforesaid."

The second count was in substance the same as the first in its prefatory averments, except that it averred that the plaintiff informed the conductor that she was exceedingly old, infirm and deaf, and also informed the conductor that her son would meet her at the depot in Birmingham, and that she was wholly without money or means, and after finding that she had passed Birmingham she became greatly worried and frightened. After making such prefatory averments, the second count then continued as follows: "She did not know where he [her son] resided, and she was at the depot without money or means, and suffered great anxiety, not being able to learn where he lived and having no means with which to hire a conveyance to carry her to his home. After wandering about the depot for a while, a stranger, seeing her great distress, hired a vehicle for her and told the driver to carry her to her son's if his home could be found, and if not to return her to the depot; she got into the conveyance provided for her by the said stranger and traveled for a long while and until night hunting for the home of her said son. The weather was exceedingly cold and disagreeable, and before reaching the home of her son, a heavy rain fell, in which she was thoroughly drenched and made wet. She has suffered great mental anguish and anxiety and by reason of the exposure and worry she was made sick and contracted rheumatism and other ailments by which she has been afflicted ever since, and from which she has greatly suffered and has been permanently injured, and has spent considerable sums of money for nursing, medicines and medical attendance in attempting to affect a cure of her said ailments."

The defendant moved to strike from the first and second counts, respectively, the averments which are quoted

above, upon the grounds that the matters alleged in said parts of each of said counts were irrelevant and immaterial, and that the damages sought to be recovered from the facts alleged therein were remote and not proximate damages. This motion was overruled and the defendant duly accepted. The defendant pleaded the general issue and by special pleas the contributory negligence of the plaintiff. Trial was had upon issue joined upon these pleas.

The evidence for the plaintiff showed that she was an old lady about 78 years of age, and she boarded the train at Careyville, Florida, a point about 100 miles east of Pensacola, and that Birmingham, Alabama, was her destination. That upon getting to Pensacola Junction she took passage in a car on the defendant's road, where she remained until she got off, by direction of the conductor, at Warrior, Alabama. The plaintiff, as a witness in her own behalf, testified that at Pensacola Junction the conductor put her on the Louisville & Nashville train, which runs thence through Montgomery and Birmingham to points north of the latter place, and told the conductor of that train that there was an old lady he desired him to take in charge; that when the latter conductor came to get her ticket he said: "You want to go to Birmingham, do you?" and plaintiff told him "Yes." Then the conductor said to her: "Stay right here, it matters not who gets on or who gets off," and plaintiff said: "I will be here when you come; I will stay here," to which the conductor replied: "All right." She testified that the conductor did not say he was coming; he only said "All right," and this happened, as she stated, a short while after they left Pensacola Junction.

The evidence shows, without conflict, that the conductor on the defendant's train, which brought the plaintiff to Montgomery, did not go further and have charge of the train, beyond the latter point, but that there was a change of conductors at that point; and another and different conductor from the one that brought the train into Montgomery took charge of and carried the train on to Birmingham and Nashville, and there is no evidence that the conductor from Flomaton to Montgomery ever communicated anything that passed between him

and the plaintiff to the conductor who had charge of the train from Montgomery to Birmingham.

G. M. Adams was the conductor from Montgomery to Nashville. He testified that he took charge of the train at Montgomery and the other evidence was to the same effect; that the train was on time and they reached Birmingham at 12:01 and left at 12.25, having remained there 24 minutes; that there was nothing to prevent the plaintiff from getting off the train at Birmingham while it was standing there under the shed; that as they approached Birmingham the flagman called out: "Birmingham, plenty of time for dinner," in a tone of voice loud enough to be heard distinctly all over the coach; that he did not know the plaintiff was deaf, as she did not tell him she was, nor did she tell him that her son was expected to meet her at the depot; that she did not ask him to inform her when they reached Birmingham, nor to aid her in getting off, or give her any information; that he discovered after leaving Birmingham, by being so told by the flagman, that the plaintiff was on the train, when he told her that he could not put her off before reaching Warrior, so as she could be properly taken care of, as it was raining very hard, and when they reached Warrior he put her off with instructions for her to be sent back to Birmingham on the down train, which was due then at 2:20, and this was done, carrying her to the latter place at 3:40. The evidence for the plaintiff further tended to show that upon the day she arrived at Birmingham she telegraphed her son of her expected arrival and asked him to meet her at the station; that in response to said telegram her son was at the depot in Birmingham waiting for her, but according to the rules and regulations of the defendant he was not allowed to enter within the gates, and after waiting 20 or 30 minutes for her to disembark from the train, without seeing her, he left the depot. The evidence for the plaintiff further tended to show that upon the train arriving at Birmingham she did not hear the station announced by either the flagman or the conductor, and she remained in the car during the time the train was at Birmingham,

and that after her return from Warrior, where she had taken the down train, when she arrived in Birmingham her son was not at the station to meet her, and she was without means and food; that after remaining in the waiting room a long time a stranger to her hired a hack and instructed the hackman to take her to the home of her son; that it was very cold and raining and that one of the window glasses of the hack was broken; that the hackman did not know where her son lived, and in trying to find his residence he drove about the city of Birmingham about two or three hours, through the cold and rain and finally found the house of her son just before dark, and that by the exposure and riding about the city trying to find her son's house, she contracted a severe cold and rheumatism.

There was a conflict in the evidence as to whether the plaintiff informed the conductor who had charge of the train from Montgomery to Birmingham that she was old, infirm and not accustomed to travel on railroad trains, and as to whether she requested this conductor to advise her when they arrived at Birmingham, and whether this conductor promised to inform her when she arrived at Birmingham and to assist her to alight from the train.

There were many exceptions reserved to the rulings of the court upon the evidence, but under the opinion on the present appeal it is unnecessary to set out the facts pertaining thereto.

The defendant separately excepted to the following portions of the court's oral charge, which are numbered to correspond with the assignments of error based upon their being given by the court: (35.) "But if the conductor had promised to come to her when the train reached Birmingham, she had a right to rely on that promise, and that he would come, and she was not, under those circumstances, obliged to take notice of the fact that the train had got to Birmingham, and she was not obliged to listen at or depend upon the call of the brakeman when the train reached Birmingham, as a passenger would be required to do if the passenger had no assurance at that time from the conductor." (36.)

"And so though the train got to Birmingham and stopped there, and though the brakeman or conductor may have called out—the brakeman may have called out 'Birmingham,'—thereby giving notice to the passengers of the fact that the train was at Birmingham, then if she, relying upon his promise to come to her at that time, if he did make such promise, failed to hear the brakeman call out the station of Birmingham, why she would be entitled to recover, because she was not obliged, if the conductor promised to come to her at Birmingham; she had a right to rely on that promise and wait in her seat until he came, and she was not obliged to listen to the brakeman or listen at the call of the station, but might simply expect him to come and do what he promised to do."

The defendant requested the court to give to the jury the following written charges, and separately excepted to the court's refusal to give each of them as asked : (1.) "If you believe the evidence you must find for the defendant." (2.) "If you believe the evidence you must find for the defendant under the first count of the complaint." (3.) "If you believe the evidence you must find for the defendant under the second count of the complaint." (4.) "If you believe the evidence you must find that the conductor who had charge of the train when it reached Birmingham was not the conductor who made to the plaintiff the promises alleged in the complaint, if from the evidence you believe that any such promises were made to the plaintiff."

There were verdict and judgment for the plaintiff, assessing her damages at $1,250. The defendant appeals, and assigns as error the several rulings of the trial court to which exceptions were reserved.

THOS. G. & CHAS. P. JONES and ALEX C. BIRCH, for appellant.—The motion of the defendant to strike portions of the first and seconds counts of the complaint should have been sustained. The negligence counted upon must be shown to be the direct cause of the injuries complained of, in order to authorize the plaintiff's recovery. The damages claimed in the portions of the counts

objected to are remote and are not the natural and proximate consequence of the negligent act complained of as injurious.—*L. & N. R. R. Co. v. Dancy,* 97 Ala. 338; *Trigg v. St. Louis &c. R. R.,* 6 A. & E. R. R. Cases 345; *Donald v. Jones,* 13 Ala. 490; *Sims v. Glazener,* 14 Ala. 695; 24 Ala. 402; 30 Ala. 277; 5 Missouri 7; Redfield on Railways, 262; *Barbour County v. Horn,* 48 Ala. 466; *Leinkauf v. Morris,* 66 Ala. 406; *Wilkinson v. Searcy,* 76 Ala. 176. The averment in the second count that "she was wholly without money or means" was immaterial, and should have been stricken on the motion of the defendant. The general rule is that damages are not affected by the financial circumstances of either party to the action.—*Ware v. Cartledge,* 24 Ala. 626; *Penn. R. R. v. Roy,* 102 U. S. 460; *Pa. R. R. Co. v. Brooks,* 57 Pa. 344.

All the books lay down the doctrine that the only duty incumbent on the person in charge of the train, is to call the stations in the ordinary manner and give the passengers a reasonable time in which to alight in a safe place. It is not the duty of the conductor to notify each passenger individually of his journey's end, and it would require a man of remarkable memory to accomplish this task.—*Sevier v. V. & M. R. R. Co.,* 18 A. & E. R. R. Cases, 245; *Tillery v. Bond,* 38 Fed. Rep. 825. The defendant was under no duty to assist plaintiff off the cars at Birmingham.—*Raben v. R. R.,* 73 Iowa 581; *Laffin v. Buffalo R. R.,* 106 N. Y. 136.

LANE & WHITE and JOHN T. SHUGART, *contra.*—The cases are uniform in holding that mental worry and anxiety growing out of being carried beyond one's destination are proper elements of damage: and so also are damages resulting from being exposed to cold and rain. *Brown v. C. M. & St. P. R'way Co.,* 54 Wis. 342; *L. & N. R. R. Co. v. Dancy,* 97 Ala. 340.

HARALSON, J.—1. It is often difficult to determine what is and what is not the proximate cause in contemplation of law. Mr. Cooley lays down the rule for its determination to be: "If an injury has resulted in consequence of a certain wrongful act or omission, but

only through or by means of some intervening cause, from which last cause, the injury followed as a direct and immediate consequence, the law will refer the damage to the last proximate cause, and refuse to trace it to that which was more remote. The chief and sufficient reason for this rule is to be found in the impossibility of tracing consequences through successive steps to the remote cause, and the necessity of pausing in the investigation of the chain of events at the point beyond which experience and observation convince us we cannot press our inquiries safely," etc.; and he adopt what Addison says on the subject: "If the wrong and the resulting damage are not known by common experience to be naturally and usually in sequence, and the damage does not, according to the ordinary course of events, follow from the wrong, then the wrong and damage are not sufficiently conjoined and concatenated as cause and effect to support an action."—Cooley on Torts, p. 73, § 69. Mr. Bishop in stating the same principle, says: "If, after the cause in question has been in operation, some independent force comes in and produces an injury, not in its natural or probable effect, the author of the cause is not responsible."—Bishop on Non-Contract Law, §§ 41, 42; Wharton on Law of Neg. § 75; Shearman & Red. on Neg. § 26. Again it has been held, that "The cause of an injury is in contemplation of law that which immediately produces it in its natural consequences; and, therefore, if a party be guilty of an act of negligence which would naturally produce an injury to another, but before such injury actually results, a third person does some act which is the immediate cause of the injury, such third person is alone responsible therefor, and the original party is not responsible, even though the injury would not have occurred but for his negligence."—16 Am. & Eng. Ency. Law, 436, 446, n. Many cases are referred to by these authors, as illustrative of these rules; and in *Lewis v. Flint*, 54 Mich. 55, COOLEY, C. J., discusses at length and refers to many adjudged cases on the subject, in a case similar to the one we have before us; and this is the doctrine of this court. In *Western R. Co. v Mutch*, 97 Ala. 194, the principles above

referred to and quoted, were there also quoted and approved, the court, by STONE, C. J., adding: "The authorities from which we have quoted are everywhere regarded as standard. What they assert is but the condensation of the utterances of a very great number of the highest judicial tribunals, wherever the principles of the common law prevail;" citing a number of these authorities. The same principles are recognized in our late case of *Armstrong v. Montgomery St. R'y. Co.*, 123 Ala. 233; 26 So. Rep. 349, where it is said :"The logical rule in this connection, the rule of common sense and human experience, as well, * * * is that a person guilty of negligence, should be held responsible for all the consequences which a prudent and experienced man, fully acquainted with all the circumstances which in fact existed, whether they could have been ascertained by reasonable diligence or not, would, at the time of the negligent act, have thought reasonably possible to follow, if they had occurred to his mind;" citing Shear. & Red. Neg. § 29. See also *Ala. Gr. So. R. Co. v. Arnold*, 80 Ala. 600.

2. It is clear under these rules, that much of that part of the first count of the complaint which defendant moved to strike, was liable to be stricken. The matters, in the main, there set up, as causing plaintiff's damage, were independent causes of injury, which did not, according to the ordinary course of events follow from the wrong complained of, and were not so conjoined therewith as to support the action. The motion to strike, however, was directed to the whole of the portion objected to, and in order to be sustained the whole should be bad.—3 Brick. Dig. 705, §§ 67, 68. The part moved to be stricken contained the clause: "After she found that she had left Birmingham, she was very much frightened and was very anxious and suffered a great deal of mental worry and anxiety and continued to suffer worry and anxiety until she reached the house of her said son." This averment is made independent of its connections, and sets up a proper element of damage, as the direct result of being carried beyond her destination.—*L. & N. R. R. Co. v. Dancy*, 97 Ala. 340. On this account, the motion to strike was properly overruled.

3. The defendant moved also to strike the concluding portion of the 2d count in the complaint beginning with the words "She did not know where he resided," etc., down to and including the words "A cure for her said ailments." This portion of the complaint sets up improper elements of damage, as being too remote and not proximate to the wrong complained of, and the motion to strike should have been granted.

4. There are very many exceptions to the admission of evidence against defendant's objections, to consider which in detail would prolong, without advantage, this opinion to an extraordinary length. From the principles heretofore announced, the learned judge of the city court, will be able to apply the law in the admission and rejection of evidence on another trial. We may say, generally, that if plaintiff was carried beyond her destination by no fault of her own, but by failure of the company's agent to perform his duty in this respect, the company is liable in damages (25 Am. & Eng. Ency. Law, 1112 and authorities there cited); and in such case, whatever delay, deprivation, vexation, anxiety and suffering of mind the plaintiff experienced, and which were consequent upon such wrongful act, and if any harm or injury was occasioned thereby to her health, in returning to the point of her destination, it should properly enter and be considered as elements of recoverable damage; but what happened to her afterwards, in going to her sons' house, and how that trip affected her, is foreign to the case.

5. The evidence tends to show that the conductor who made to plaintiff the alleged promise to put her off at Birmingham, brought the train no further than Flomaton, 180 miles south of Montgomery, and that the car in which she was riding, was brought by the Mobile train, in charge of a different conductor, to Montgomery, where the crews were again changed, and a new conductor, by the name of Adams, there took charge and carried the train to Birmingham and points north of that place. Adams testified, he knew nothing about the plaintiff, had no conversation with her, did not know of her alleged infirmities, and was not informed

and knew nothing of what had passed between her and any other conductor. He and the brakeman, Webb, both swore, that on arrival of the train at Birmingham, as it was approaching, and after it had stopped, the station was distinctly and audibly announced, and passengers told they would have twenty minutes for dinner; that the train remained there twenty-four minutes, and departed on its north-bound run. He did not discover that plaintiff was on the train until he arrived about Boyles Station, a few miles above Birmingham, and carried her to Warrior, the next station, and put her off, to which she made no objection, with directions for her to be brought back to Birmingham on the south-bound train, which was done, arriving there about 3:40 p. m. He also testified that Warrior was the first station at which he could properly put her off.

The plaintiff testified that the conductor from Pensacola told her, "If you want to go to Birmingham, you sit right in here, and don't get off," and she replied, "I will be right here when you come to put me off;" that he never came back any more until between Birmingham and New Castle; that she never heard Birmingham called out on arrival there; that the conductor did not say anything about letting her know when they got to Birmingham, and that when she told him, she wanted him to put her off, he replied, "All right." She also testified, that she had this conversation with the conductor in the night after she changed cars at Flomaton, and between there and Montgomery, and answered further, that the man pointed out to her—evidently referring to Conductor Adams, who had been examined—to use her own language, "looked like the conductor who told me to sit down where I was until he came and notified me, it made no difference who got off."

Under the pleadings in the case, and the evidence, we can discover no fault with those portions of the court's general charge, made the basis of assignments of error 35 and 36.

Nor was there error in refusing to give the several charges requested by defendant, as there was conflict in the evidence upon which they were respectively based.

[Henderson *et al* v. J. B. Brown & Co. *et al.*]

It may be well to add, that whether the conductor's promises, as alleged to have been made to plaintiff to put her off at Birmingham, were binding on the company or not, and whether he was bound to cause such promises, if made, to be communicated to his successors, if there was a change of conductors before plaintiff reached her destination, and that each was bound to fulfill these promises are questions concerning which we express no opinion.

The argument of counsel for plaintiff excepted to by defendant, in some of its phases was not legitimate; but as it will not likely be indulged on another trial, we deem it unnecessary to comment on it.

For the errors indicated, the judgment must be reversed and the cause remanded.