SCHROEDER *v.* DETROIT, GRAND HAVEN & MILWAUKEE RAILWAY CO.

1. CARRIERS—RAILROADS—FRIGHT—DAMAGES.

As an element of damages for carrying a female passenger upwards of a mile past her destination and compelling her to return along the tracks in the rain and darkness, fright is a proper subject of compensation in an action against the carrier.[1]

---

[1] The authorities on the measure of damages for carrying a passenger beyond destination are collated in notes in 17 L. R. A. (N. S.) 1226 and 41 L. R. A. (N. S.) 745.

As to what injuries may be deemed the proximate result of discharging passengers at improper place or one not his destination, see note in 7 L. R. A. (N. S.) 1177.

2. Same—Pleading—Damages— Special Averments — Declaration.

Allegations in the declaration as to plaintiff's fright, humiliation, accompanied by averment that she became wet, chilled, exhausted, humiliated on account of the wrong of defendant, and suffered physical and mental pain, and great mental anguish and humiliation, justified the admission of evidence that she suffered physical discomfort and took cold.

3. Same—Damages—Verdict.

Under the circumstances disclosed by the testimony, plaintiff's judgment of $425 was not excessive.

Error to Shiawassee; Miner, J. Submitted January 10, 1913. (Docket No. 51.) Decided April 8, 1913.

Case by Etta Schroeder against the Detroit, Grand Haven & Milwaukee Railway Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Harrison Geer*, for appellant.

*A. L. Chandler* and *George Pardee*, for appellee.

Moore, J. Miss Etta Schroeder brings this action to recover damages for being carried beyond Burton station on the evening of October 26, 1911. Plaintiff was 29 years of age, a domestic servant living in the city of Detroit. Her nephew, Jonah Cook, telephoned her from Burton on the day in question that a brother of hers was at the point of death. Arriving at defendant's Milwaukee Junction station, she inquired of the ticket agent as to whether it would be possible for her to reach Burton that evening, and was informed that the local train had gone, but that she could take the fast train and change to the local at Durand. She purchased her ticket for Burton and boarded the fast train, and when they reached Durand got off and boarded the local train for Burton. The conductor of the local train took up her ticket and put a slip with a capital B thereon in the window of the seat

where plaintiff was sitting. Burton was not a regular stop for the local train, but it did stop upon flag to discharge and receive passengers. The train, through a mistake of the conductor, did not stop at the station, but ran something over a mile west thereof, where it stopped, and the plaintiff alighted.

Her version of what occurred is as follows:

" I did not see him, the conductor, again until the train stopped. It was my understanding that we had then arrived at the station.

"Q. What did he say to you or do when you saw him next?

"A. He opened the door, and I supposed I was at the station, and he got down to help me down. At Burton.

"Q. You say he opened the door. What did he do, if anything, then towards motioning or beckoning you to get off?

"A. Well, he opened the door and looked in, and I went to the door; he beckoned to me to come, and I supposed I was at Burton. The conductor helped me off, and after doing so said, 'I am sorry, madam, but I have taken you past your station.' I asked him how far, and he replied, 'Oh, two or three rods.' The train stopped there just an instant. Then the conductor and brakeman got back on the train, and it went on. It was a cold, wet night, and had been snowing. I had a suit case and a parcel with me. The conductor helped me off with my package. I should think the suit case should weigh probably 35 pounds. It was a load to carry.

"Q. When he put you off there, or assisted you to get off there, you say it was cold and sleety. What was it as to being light or dark there at that place?

"A. It was very dark.

"Q. Explain to the jury how it was as to your seeing the fences or the track.

"A. I could not see the fences.

"Q. When he put you off there, and the train had gone so you could realize where you were, how did you feel then? Just describe to the jury your feelings.

"A. I started to walk up the track, carrying my grip and parcel. I looked in different directions to see whether there were any lights. I could see none. I could not tell the exact distance I walked before I saw a light or met

any one.   I think it was fully five minutes before I saw a
light.   I walked about as fast as I could go.   I saw a
light up the track in the direction I was going.   It seemed
to be far away.   I kept on going, hurrying as fast as I
could.   I walked until I was almost opposite the light.   I
then began to call out as loud as I could.   I called five or
six times.   I was then answered.   Some one opened the
door of the building, which I afterwards learned was a
celery house, located one mile west of Burton.   I was car-
ried on that train between a quarter and a half mile west
of that celery house.

"*Q.* What is the character of the country there?

"*Mr. Williams:* I object to it as incompetent and im-
material.

"*Q.* As to whether or not there are any houses around
it.

"*A.* There is not.   *   *   *

"*Q.* How is that country along immediately adjoining
the railroad on either side where you were put off ?   What
kind of a country is it?

"*A.* There is a swamp on either side, and there isn't
a road for half a mile from the track.

"*Q.* On either side of the railroad, what is there there?

"*A.* There is a ditch on both sides.   *   *   *

"*Q.* Did you state what the condition of the weather
was?

"*A.* I think I did.

"*Q.* As to raining?

"*A.* Raining.   My feet were soaking wet before I
reached the celery house.   I was cold, chilly, and my
clothing was wet.   I was cold, wet and damp when I
arrived at Burton.   I had no umbrella or anything to pro-
tect me against the storm.   The conductor had a lantern,
and could see how I was dressed.

"*Q.* At that time, while you were exposed to the storm
and the cold that you spoke of, what other thing, if any-
thing, added to your discomfort?

"*A.* Well, I was anxious about my brother.

"*Mr. Williams:* I object to that as fully incompetent
and immaterial.

"*Q.* I am not asking about that.   Any other pain or
suffering which you experienced during the time you
were suffering from this cold and wet you were speaking
of until you got back to Burton?

"*A.* No; nothing more, I guess.

"*Q.* I will ask you whether or not you suffered any pain or suffering from your condition ?

"*A.* No; only just cold, chilled.

"*Q.* How did you feel, what were your feelings, as you were walking along there, cold and chilled, as you spoke of, there upon the railroad ?

"*Mr. Williams:* I object to that. I think your honor is, perhaps, correct. She can recover for the inconvenience; that is the cold. Her feelings wouldn't be a proper measure of damages. Any pain she suffered because of being cold would, perhaps, be a measure of damages, but her feelings when she was walking along would not be an element of damages.   *   *   *

"*Q.* Witness, what were your feelings by the inconvenience which you were put to during the time which you were walking from the place there in the dark until you got to the depot ?

"*Mr. Williams:* I object to that as not proper element of damages in this case.

"*The Court:* She may answer that.

"*A.* Why, I was frightened.

"*Mr. Williams:* I object to that, and move to have the answer stricken out.

"*Mr. Chandler:* I object to that.

"*The Court:* I will leave that at the present time and think about it.

"*Mr. Williams:* We may have an exception ?

"*The Court:* Yes; you may have an exception. That rule gives you an exception to all of this, Mr. Williams.

"*Q.* Witness, what else, what other inconvenience or feeling, did you suffer ?

"*A.* I was exhausted.

"*Mr. Williams:* I object to that for the same reason, not a proper element of damage.

"*The Court:* You may answer. (Exception for defendant.)

"*A.* Why, I was exhausted, tired, humiliated.

"*Mr. Williams:* I move to have the answer stricken out as not a proper element of damages.

"*Mr. Chandler:* I object to it.

"*The Court:* It may stand. (Exception for defendant.)

"*Q.* Witness, when you arrived at this house or this place where you saw the light, did you see anybody there that you knew ?

"*A.* No, sir; I did not.

"*Q.* When the man came out there, whoever it was, how far did he come with his lantern before he came where you were?

"*A.* Oh, possibly four rods. I didn't meet any one I knew at the celery house. The man that assisted me had to come possibly about four rods. He was a stranger to me. I explained my situation to him. It was Mr. George DeWitt, as I learned afterward.

"*Q.* Witness, when you arrived there before you got to the place where the man was with the lantern, you may tell the jury whether or not you had to cross cattle guards.

"*A.* I did.

"*Q.* You may tell them whether or not you could see where you were walking or what you were doing?

"*A.* I got on the cattle guard, and then I called to him, and he came with a lantern so I could see to get across. I could not tell where I was when I reached the cattle guard. I think the celery house was about four rods from the cattle guard. The men were on the inside of the building. Mr. De Witt offered to take me to Burton.

"*Q.* At the time you were at the cattle guard and Mr. De Witt came there and spoke to you, after you informed him your situation and condition there, will you tell what your physical condition and mental condition was at that time?

"*Mr. Williams:* I object to anything about mental condition. The physical condition might be proper.

"*The Court:* I think, Mr. Chandler, that is a little too broad. I think it should be on account of her being compelled to travel a distance in the dark, in the rain, and over the road she did.

"*Q.* I will add from the fact that you have been compelled to travel that distance in the dark and over the road in a storm, as you did.

"*Mr. Williams:* I object to that as not a proper element of damages.

"*The Court:* She may answer that. (Exception for the defendant.)

"*A.* I was humiliated to think I had to call on strangers to help me out of the plight I was in.

"*Mr. Williams:* I move to strike that answer out.

"*The Court:* Wait until she gets the answer finished.

"*Q.* Go on and tell your condition.

174 MICH.—44.

"*A.* I was glad of assistance to—

"*Q.* No; tell your own condition.

"*The Court:* You may answer that. (Exception for defendant.)

"*A.* Well, I was wet, muddy, cold, and tired.

"*Q.* How were you as to being nervous. (Same objection.)

"*The Court:* Objection overruled. (Exception for defendant.)

"*A.* Yes; I was very nervous.

"*Q.* How were you as to being exhausted or not?

"*Mr. Williams:* These certainly are leading. We may have an objection and exception to all this class of testimony without taking it.

"*The Court:* Objection overruled.

"*Mr. Williams:* I say we may have an objection to all of it?

"*The Court:* Yes. (Exception for defendant.)

"*Q.* Lady, won't you tell? (Question read.)

"*A.* I was; I was very tired. I could hardly go any farther.

"*Q.* But your feelings; how did you feel?

"*A.* I was humiliated.

"*The Court:* Mr. Chandler, you must connect that, as I have stated, or I shall sustain the objection.

"*Q.* Witness, do you understand that we are asking now what was your condition in your mind and feelings, physical condition, coming or arising from the tramp there in the dark and in the storm and under the conditions that you were in there? If you can tell, tell it; if you can't, let's get along.

"*A.* I was frightened, scared; I didn't know what I was going to step into any moment; I couldn't see.

"*Mr. Williams:* This is all subject to my objection.

"*The Court:* It may be. (Exception for defendant.)

"Mr. De Witt had a top buggy.

"*Q.* What conveniences or protection did you have against the elements?

"*A.* A wet blanket.

"*Q.* A horse blanket?

"*A.* Yes, sir. The roads were in fairly good condition; it hadn't rained very long. The storm continued, but it wasn't raining as hard.

"*Q.* After you had been walking this distance and carrying your grips, getting into the buggy in the condi-

tion that you have described, how did you feel then?
(Same objection. Objection overruled. Exception for
defendant.)

"*A*. Wet, cold, and chilled, nervous.

"*Q*. On your trip from the time you got in the buggy
until you arrived at Burton, you may state whether or not
you suffered any excitement or mental anguish from the
position which you were in. ·

"*Mr. Williams:* I object to this as not a proper ele-
ment of damages in this case for the reasons heretofore
given.

"*The Court:* Objection overruled. (Exception for de-
fendant.)

"*A*. I was nervous; I was anxious to get to my desti-
nation.

"*Q*. How were you as to being excited or otherwise?

"*A*. I was very excited.

"*Mr. Williams:* I move to strike that out, if your
honor please, the fact she was anxious to get to her desti-
nation.

"*Mr. Chandler:* I consent; she was anxious to get to
her destination be stricken out.

"*The Court :* That may be stricken out.

"*Mr. Williams :* I move the rest of the answer be
stricken out.

"*The Court :* That may stand; that is, if it was the
result of this. (Exception for defendant.)

"*Q*. Witness, you may state whether or not you suf-
fered any mental anguish from your situation.

"*A*. I did.

"*Mr. Williams :* I move to have the answer stricken
out; the same objection which I have made.

"*The Court:* It may stand. (Exception for defendant.)

" The celery house was a mile from Burton, and is
located on the north side of the railroad. It is east of the
swamp or low land. I did not meet my relative at Bur-
ton, but did meet him about one mile and a half north of
there. Mr. DeWitt took me that far.

"*Q*. Well, as to whether or not the effects of your feel-
ings, cold, chilled, and wet, and so on, continued with you
up until the time you met your nephew?

"*A*. It did.

" *Mr. Williams:* Same objection, and move to have the
answer stricken out.

"*The Court:* It may stand. (Exception for defendant.)

"*Q.* How were you at that time as to feeling better or worse from your cold and wet which you received?

"*A.* I didn't feel any better.

"*Q.* What was your condition at that time as to being exhausted or not?

"*A.* I was about all in.

"*Q.* When you arrived—whereabouts was it—did you finally get where your brother was?

"*A.* I did.

"*Mr. Williams:* I object to it as incompetent and immaterial.

"*The Court:* Objection overruled. (Exception for defendant.)

"*Q.* What was your condition when you arrived at that place, with reference to the way you had been all along your route?

"*A.* Well, I was in the same condition.

"*Mr. Williams:* Same objection.

"*The Court:* It may stand. (Court reads from the case of *Chamberlain* v. *Railway*, 122 Mich. 477 [81 N. W. 339]).

"*Mr. Chandler:* It seems as though, in a case of this kind, we would have a right to the same kind of damages that we would if a person spit in another person's face.

"*The Court:* You have; you have exactly; but if a person didn't spit in his face, but threatened to—he didn't spit in his face, but he thought he was going to—he couldn't recover any damages. That would be mental suffering, and he couldn't recover damages; but if he did spit in the face there would be mental damages, accompanied by physical damages as a result of the physical damages. That is what I am permitting you to recover in this case.

"*Mr. Chandler :* The difference is we claim when they allowed this lady or invited her off into this position it is the same as assault and battery.

"*The Court :* Judge Grant seems to hold against you. That is the only trouble that I can find. You may proceed. (Question read. Exception for defendant.)

"*The Court :* You say all along the road. What do you mean, Detroit?

"*Q.* I mean from where you alighted from the train after you got wet and chilled. Had you got dry?

"*A.* No.

"*Q.* Or relieved from your distress in any way at that time?

"*A.* No, sir.

"*Q.* How did you feel at the time you were there? You may tell the jury whether or not you had any suffering from your wet and inconvenience.

"*A.* My feet were wet and cold.

"*Q.* Had you changed your shoes yet, clothing?

"*A.* No; I had not.

"*Q.* When you arrived at that place, did you stay overnight?

"*A.* I did.

"*Q.* From that exposure, wet clothes, you may state whether or not you suffered in your health.

"*A.* I got a terrible cold.

"*Mr. Williams:* I move to have the answer stricken out. I don't think it is covered by the pleadings.

"*The Court:* Anything in the pleadings to cover that?

"*Mr. Chandler:* I didn't draw them; it is Mr. Chapman's case.

"*Mr. Williams:* This amended declaration is yours, isn't it?

"*Mr. Chandler:* I don't know whether you call it mine or not. It is Mr. Chapman's, with some additions to it.

"*Mr. Williams:* I see nothing about having taken any cold. I move to have the answer stricken out.

"*Mr. Chandler:* It says she was chilled.

"*The Court:* The answer may stand. It says 'being compelled to walk, became wet, chilled, and exhausted.' I think that taking cold would be a question for the jury, whether that is the natural result or not. (Exception for defendant.)

"*Q.* Witness, what was your condition that night?

"*A.* I was nervous; I didn't sleep all night.

"*Mr. Williams:* Same objection. I move to have the answer stricken out as not a proper element of damages.

"*The Court:* It may stand.

"*Mr. Williams:* I think it is improper, as not a proper element of damages, and there is nothing to show the reason she didn't sleep. It is not competent. She might have been sitting up with her brother; she might have been nervous over her brother. I think it is improper anyway, but I offer that as another reason why it might be improper.

"*The Court:* It may stand for the present. (Exception for defendant.)

"*Q.* What was your condition at that time as to being excited and exhausted or otherwise?

"*Mr. Williams:* It is leading; I object to it for the reason it is leading, and also for the reason I have given as to the other question.

"*The Court:* She may answer. (Question read. Exception for defendant.)

"*A.* I was very excited when I reached my destination.

"*Q.* What was the difficulty; why was it you couldn't sleep, if there was any?

"*A.* Well, I was nervous; I would try to go to sleep, and I couldn't.

"*Q.* How is it at the present time? You may state whether or not you have recovered from it yet.

"*A.* No; I have not.

"*Mr. Williams:* Same objection. They do not allege in the declaration she sustained any physical injury.

"*Mr. Chandler:* Suffered physical and mental pain, great mental anxiety; that she became chilled, wet, and exhausted. That would be something in the line of physical injury.

"*Mr. Hicks:* There is no injury to her health alleged in the declaration.

"*The Court:* The allegation of damages says: 'That she then and there became wet, chilled, exhausted, humiliated; on account thereof she has suffered physical and mental pain.' (Question read:) 'Witness, how long did the effects of the injury you sustained from this cold and trip that evening after you left the train, how long did those effects last? (Answer read.)

"*The Court:* I think that answer may stand. (Last answer and question read.)

"*The Court:* The answer may stand upon this theory: A cold would be the natural result of being wet, chilled, and exhausted. I think they have a right to show how long. That may stand. Anything said as to her cold, the results of that, I think may be stricken out.

"*Mr. Williams:* What do you strike out?

"*The Court:* Just what I stated. Proceed."

A lengthy cross-examination followed, which did not materially change the testimony of plaintiff.

As has already appeared, counsel for defendant admits

there is a liability on the part of defendant. From a judgment in favor of plaintiff for $425, the case is brought here by writ of error.

We quote from the brief:

" We rely in this brief:

" (1) Upon error upon the part of the trial judge in admitting testimony as an element of damages of fright, humiliation, nervousness, and mental anguish and in refusing to give our requests to charge covering these matters.

" (2) In permitting plaintiff to testify that she contracted a severe cold; that she was nervous after her experience, and has not recovered from that yet.

" (3) In overruling our motion for a new trial, for the reason that the verdict rendered by said jury was excessive in amount."

Each of these groupings is discussed at length.

1. Upon this subject the trial court charged the jury, among other things, as follows:

" Fright, unaccompanied by physical injury, cannot be made the basis of recovery for damages."

Again:

" Or, in other words, if you find that she has not suffered any physical injury in this matter, then she could recover only nominal damages, which would be six cents."

Again:

" Gentlemen, as I said to you in the first place, fear, unaccompanied by physical suffering, is not a subject for damages. So in this case if you should find that she did not suffer any physical injury, then she could recover only nominal damages."

Again the court charged:

" I charge you that fright must be accompanied by some actual injury caused thereby and traceable directly thereto to be a subject of damages. Mere fear, unaccompanied by injury, not accompanied by injury therefrom, cannot be made a subject for recovery of damages. So the question is: What did she suffer from any injury she may have received? When you determine that, that should be your verdict."

Counsel cite in support of their position a number of cases, and among them is the case of *Nelson* v. *Crawford*, 122 Mich. 466 (81 N. W. 335, 80 Am. St. Rep. 577). We have examined these cases, and do not find any of them controlling, though there is a clear intimation in them that if the fright is accompanied by physical injury it is an element of damage.

In volume 3, Sutherland on Damages (3d Ed.), at page 2774, appears the following:

"Damages for Physical and Mental Suffering.—The carrier must make compensation according to the nature of the injury, when the proper action is brought; such injury may consist of personal inconvenience, sickness, loss of time, bodily and mental suffering, loss of capacity to earn money from personal injury, pecuniary expenses, disfigurement or permanent physical or mental impairment. There is no precise rule by which the extent of recovery for pain and suffering can be measured; but it is well established they are to be compensated when they result from injuries received by the party suing from the wrongful acts or culpable negligence of the defendant. The determination of the amount is committed to the judgment and good sense of jurors, subject to practical revision by the court to correct and relieve from manifest excess; and it is now established that not only bodily pain, but, connected with it, mental suffering—anxiety, suspense, fright, sense of wrong from insult or indignity,—may be treated, when the facts will justify it, as an element of the injury for which compensation should be allowed"—citing a large number of cases.

See, also, volume 3, Thompson on Negligence (2d Ed.), § 2782; *Pennsylvania Co.* v. *Hoagland*, 78 Ind. 203; *Louisville, etc., R. Co.* v. *Quick*, 125 Ala. 553 (28 South. 14).

2. Counsel say:

"The trial judge erred in permitting plaintiff to testify to physical injury; the same not having been alleged in the declaration."

The declaration is not a model one, but it contains, among other statements, the following:

"But notwithstanding the duty aforesaid, said defendant wholly disregarded this duty and carelessly and negligently carried said plaintiff beyond said station of Burton about one mile and a half into a swamp, where the conductor of said train stopped said train, and in the presence of other passengers, who were on the same car with plaintiff, directed and compelled her to leave said train and go forth in the night-time, and while it was raining and otherwise a cold, disagreeable night, * * * and on account of the actions and doings of the defendant and violation of the duty aforesaid, said plaintiff was compelled to walk back towards said station of Burton through said swamp in the storm and darkness along the line of the railway track of said defendant, and said plaintiff was in great fear lest in the darkness of the night she might step off from the embankment of said railway and fall into said swamp where it is filled with mud, muck, and water, and also said plaintiff was placed in great fear and suffered great terror lest she might be overtaken by men and meet tramps and hoboes who frequent defendant's railway track in their travels through the country; that said plaintiff walked back eastward toward said station about one half mile, where she then saw a light some distance from the track, and called for help; that assistance was brought her by parties who were at work near said light, and who provided her with a rig and drove her the balance of the way to Burton, and plaintiff says she was greatly humiliated and chagrined at being compelled to cry out for assistance, and to be found in such a plight by those rendering her such assistance, and being compelled to call upon people for help and to accept the same; that she then and there became wet, chilled, exhausted, humiliated, and on account thereof has suffered physical and mental pain and great mental anguish and humiliation."

We think these statements are sufficient to permit testimony of the physical discomfort suffered by the plaintiff and that she took cold, as we may take notice of the fact that colds frequently follow exposures of the character stated here. See Baldwin on Personal Injuries (2d Ed.), § 612; *Montgomery* v. *Railway Co.*, 103 Mich. 46 (61 N. W. 543, 29 L. R. A. 287); *Snyder* v. *City of Albion*,

113 Mich. 275 (71 N. W. 475); *Groat* v. *Railway*, 153 Mich. 165 (116 N. W. 1081).

3. Counsel say:

" The trial judge should have granted our motion for a new trial, for the reason that the verdict of the jury was excessive in amount."

Under this head a number of cases are cited by counsel. We have examined them, and none of them is controlling. The case of *Humphrey* v. *Railways Co.*, 166 Mich. 645 (132 N. W. 447), where a verdict of $500 was reduced to $100, is mentioned. A reference to the case will show it to be very different from the instant case. In *Light* v. *Railway Co.*, 165 Mich. 433 (130 N. W. 1124, 34 L. R. A. [N. S.] 282), where a young man was evicted from a train at about 6 o'clock in a July evening, this court reduced the verdict from $500 to $250. If that amount was permitted to be recovered under the facts disclosed by that record, we do not think the verdict in the instant case should be set aside because it was excessive.

The judgment is affirmed.

STEERE, C. J., and McALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.