## Seaboard Air Line Ry. Co. *v.* Standifer.

### *Carrying Past Destination.*

(Decided November 7, 1914.  Rehearing denied December 17, 1914.
67 South. 391.)

1. *Carriers; Passengers; Carrying Beyond Destination; Evidence.*
—The evidence examined and stated, and held to show that the failure of the conductor to stop the train as requested constituted simple negligence conclusively rebutting any idea of wantonness.

2. *Same; Remote Result.*—Where it appeared that the conductor sent plaintiff home in an automobile, after having carried plaintiff beyond his destination, and that plaintiff later had an attack of typhoid fever, the fever cannot be said to have been proximately caused by the negligence of the conductor in such a sense as to constitute an element of recoverable damage against the railroad, and the admission of any testimony on that point is erroneous.

3. *Damages; Aggravation of Illness; Proximate Cause.*—Where exposure to weather or cold results in further physical debility to a person already sick or feeble, damages for causing such exposure are recoverable.in a proper case.

APPEAL from Birmingham City Court.
Heard before Hon. JOHN H. MILLER.

Action by William Standifer, Jr., by next friend, against the Seaboard Air Line Railway Company for damages for carrying him beyond his point of destination. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Transferred from Court of Appeals under the provisions of the act creating such court.

TILLMAN, BRADLEY & MORROW, L. C. LEADBEATER, and E. CRAMPTON HARRIS, for appellant.

THOMPSON & THOMPSON, and GUY M. THOMPSON, for appellee.

DE GRAFFENRIED, J.—This suit was brought by William Standifer, Jr., by next friend, to recover damages for the negligent failure of the defendant's conductor to stop a train on which plaintiff was a passenger, at the point of his destination, and to allow him there to disembark from the train.

It seems that the plaintiff is a little boy, and that on the 4th or 5th day of October, 1912, he and his father and mother and another child took the defendant's train at Parsons, Ala., for Irondale, Ala. The plaintiff's father paid the conductor the fares to Irondale, and on the subject now under consideration testified as follows: "We first went over to Parsons and waited there some little time; I don't know how long. When we got on the train and the conductor came around for the fare, I said, 'How much is the fare for my wife and two children and myself to Irondale?' I told him I wanted to get off at Irondale, and asked him if he would stop, and he said he would. I asked him what the fare was for four of us, and he said $1. I gave it to him, and he said, 'I will stop at Irondale. We came

on, and I didn't know we passed Irondale until Mr. Cox called my attention to it. I called the conductor's attention, and he says, 'Well, I am sorry.' He says, 'I have been used to running on the through train.' He said the reason that he made the mistake was on account of he was used to running on the through train, and they put him on the local that night, and he forgot the station. We came into town [Birmingham] and he [the conductor] said, 'I will get some conveyance and pay for it out of my own pocket.' We waited at the terminal [station waiting rooms] some time, and the conductor came out in his plain clothes. He procured an automobile and paid for it, and we went home."

On the same subject a witness for the plaintiff testified as follows: "Why he told him [the father] that he was sorry [that he had carried him by the station], but he was a new man on that road, or being used to running on the fast train—I believe that it is—and he would do anything to get them back out there. He told them that he would hire a taxicab and pay for it out of his own pocket."

The mother of the little boy, on the same subject, testified as follows: "The conductor paid for the automobile. The conductor was very nice about it—very pleasant all of the time. He was very gentlemanly all during the whole trip. He done all right, except he promised to put us off at Irondale and didn't do it."

The above evidence shows that the conductor, who had been accustomed to run on a fast train—a train which made but few stops, and which was not accustomed to stop at Irondale—simply forgot to stop his train at that point, and by inadvertence carried this family on into Birmingham. The plaintiff's evidence shows that the attention of the conductor was not called to this act of forgetfulness on his part until

after he had passed Irondale. When the situation was called to his attention there was nothing left for him to do but to proceed to Birmingham with his train.— *L. & N. R. R. Co. v. Cornelius,* 6 Ala. App. 386, 60 South. 740.

(1) The mere failure of the conductor to stop the train was, under the evidence in this case, an act of simple negligence.—*L. & N. R. R. Co. v. Cornelius, supra; Yazoo R. R. Co. v. Hardie,* 100 Miss. 132, 55 South. 42, 967, 34 L. R. A. (N. S.) 740, 742, Ann. Cas. 1914A, 323.

In this case there was no circumstance indicating oppression, unkindness, ill will, insult, or reckless indifference. On the contrary, all the evidence shows that (to quote the plaintiff's mother) "he done all right, except he promised to put us off at Irondale and didn't do it." The evidence not only shows this, but it shows that so soon as the mistake was discovered this conductor did everything that the most kindly man could have done under similar circumstances. The father said: "The conductor acted very nicely. He said he was sorry. He paid for the automobile out of his own pocket."

It was eight miles from Birmingham to Irondale, and yet this conductor, whose act of forgetfulness is sought to be construed into one of wantonness or into reckless indifference, sent this family home—as the best method of repairing his act of negligence—in an automobile at his own expense. There is not only no evidence of wantonness in this record, but the evidence conclusively rebuts such idea.—*Wilkinson v. Searcy,* 76 Ala. 176.

(2) 2. The fact that the plaintiff, after the ride in the automobile above referred to, had an attack of typhoid fever, cannot be held to be so connected with the

failure of the defendant to stop the train at Irondale as to constitute an element of recoverable damages in this case. The attack of typhoid fever was not the direct consequence of the negligence complained of. It was caused by a germ—a thing entirely independent of the defendant's negligent act.

A blacksmith pricks a horse by careless shoeing. The horse, by reason of his lameness, is delayed in passing through a forest, and a tree falls on him and kills him. "Such injury would not be the measure of the blacksmith's liability."—Jaggard on Torts, p. 375.

(3) If, by reason of the defective shoeing, the horse had lost his leg, or if blood poison had set in and killed him, an entirely different proposition would be before us.

In the istance first supposed, the tree was the direct cause of the death of the horse. In the instance last supposed, the loss of the leg of the horse, or the loss of his life, is traceable directly to the defective shoeing. In the first instance supposed, the defective shoeing was the remote, and the falling of the tree the direct, immediate cause of the death of the horse. In the last case supposed, the loss of the leg or life of the horse is directly traceable to the defective shoeing as its immediate, not remote, cause. When a person is already sick, feeble, debilitated, or is lacking in physical strength, and, through the negligence of another, is caused to do some act which, as its direct result, increases such sickness, feebleness, or debility, or which causes him to do some act beyond his physical strength, and thus produces injury, such damages, in proper cases, may be recovered.

There are certain diseases, such as rheumatism, la grippe, etc., which common experience indicates are increased in intensity by exposure to cold; and such dam-

ages are frequently traceable, as its direct and immediate result, to an act of negligence. Typhoid fever is caused by a specific germ, and the germ is always the direct cause of the disease.

While in this case the testimony of the physician indicates that a person in a weakened condition is less likely to resist or throw off the germ of typhoid fever than is a strong and healthy person, common observation indicates that the strong and the healthy, as well as the weak and debilitated, are all subject to this disease. Indeed, the evidence of this physician shows that, in permitting testimony as to the typhoid fever with which plaintiff was attacked after the act of negligence complained of, the court opened wide the door of speculation and permitted the jury to consider testimony which, at best, could only produce doubt and uncertainty in the minds of the best trained medical men of the world.

The squib case, so frequently referred to in the books, has nothing to do with the facts of this case. In the squib case the squib did the injury. In this case a typhoid germ directly caused the fever. If, on the way to Irondale, the automobile had run over a bomb which an anarchist had left in the highway, and the bomb had exploded and injured the occupants of the automobile, the defendant would not be liable for that injury. The anarchist who left the bomb there would be liable.

We are not dealing here with a case where, through an act of negligence, a person is carried from a safe place into a dangerous place, and there suffers injury, or from a healthy locality into a plague stricken place, and there takes the plague. We are simply dealing with a case in which we know—in so far as human science can tell us—that a person has had a case of typhoid fever caused by the specific germ of typhoid fever. How

or when the plaintiff got that germ into his system we do not know, neither can we—nor any other human being—truthfully say, under the evidence in this case, what caused the plaintiff to succumb to the attack. All that rests in pure speculation. This is but plain common sense which addresses itself to the plain understanding of the race.

The trial court erred in allowing any testimony as to the plaintiff's attack of typhoid fever.—*L. & N. R. R. Co. v. Quick,* 125 Ala. 553, 28 South. 14; *Montgomery & E. Railway Co. v. Mallette,* 92 Ala. 209, 9 South. 363; *E. T. V. & G. R. R. Co. v. Lockhart,* 79 Ala. 315.

3. There are some other questions presented by this record, but in view of what we have above said, we do not think it necessary to discuss them.

For the reason above set out, the judgment of the trial court is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

ANDERSON, C. J., and MCCLELLAN and MAYFIELD, JJ., concur.