ELMIRA P. HOWE v. ELIZA NORTH.

[See 59 Mich. 624.]

*Contract—Breach—Measure of damages—Contract of married woman—Parent and child—Claim for board—Implied promise.*

1. In a suit involving a claim for the care and maintenance of a son of the defendant, under an alleged agreement that the plaintiff should be liberally paid therefor, it is error for the court to instruct the jury that they may allow the plaintiff, as compensation for such care, " what they believe to be just and right."

2. Upon breach of a contract, the damages should be such as fairly and reasonably arise therefrom, or such as may reasonably be supposed to have been in the contemplation of both parties at the time the contract was made, as the probable result of its breach.

3. A married woman has no general power to make contracts, and cannot be held upon her agreement to pay for the board of herself, husband, and son, nor for the board of the son after the death of the father, on an agreement made during his lifetime.

4. The law will not *imply* a promise on the part of a mother to pay for board furnished her by a daughter after the death of her husband.

5. A married woman residing with her husband is liable for family necessaries purchased by her upon her *individual* credit and *sole* agreement to pay for the same, although used in the house by the husband's family. *Campbell v. White*, 22 Mich. 178.

6. Where a mother, after the death of her husband, boarded with a daughter, and declared at several times that she should be well

paid for her care, and the surroundings of the parties imply that the mother was to pay something from her own estate for such care and board, the question of such liability may be properly submitted to the jury.

Error to Washtenaw. (Joslin, J.) Argued February 15, 1888. Decided April 6, 1888.

*Assumpsit.* Defendant brings error. Reversed. The facts are stated in the opinion, and in *North v. Joslin,* 59 Mich. 624.

*Sawyer & Knowlton,* for appellant.

*E. D. Kinne (J. F. Lawrence,* of counsel), for plaintiff.

LONG, J. The situation and surroundings of the parties to this controversy, and the property involved, are so fully set out in the opinion in the case of *North v. Joslin,* 59 Mich. 624 (26 N. W. Rep. 810), that we refer to that case for the history and some of the facts, which it will be unnecessary to state here. In that case this Court ordered that—

"All the proceedings had in both the circuit and probate courts for the county of Washtenaw in the premises be reversed, annulled, and set aside, and Mrs. North be restored to the possession and control of all her property, including that of which she has been deprived under said proceedings, and all accumulations thereon which would have accrued to her had no proceedings in the case been instituted, and her estate must not be charged with any costs, charges, fees, or expenses in consequence of such proceedings."

This order was made on the tenth day of February, 1886. Instead of such order being complied with, and said property restored, on the seventeenth day of February, 1886, Elmira P. Howe, the plaintiff in this cause, again filed her petition in the probate court for Washtenaw county for the appointment of a guardian of her mother, Eliza North, and alleged therein—

"That she is a daughter and an heir at law of said Eliza

North, and interested in her estate as a creditor and in expectancy.

" That said Eliza North is of the age of eighty-four years and upwards, and an inhabitant of or resident in Kansas City, in the state or Missouri, and is possessed of real and personal estate, situate and being in said county of Washtenaw, and the estimate value of the personal estate is the sum of $20,000, and of the real estate the sum of $4,500, or thereabouts;    *    *    *    that it is necessary that a guardian be appointed of the person and estate of said Eliza North, for the following specific reasons, viz.: because the said Eliza North, by reason of extreme old age, is mentally incompetent to have the charge and management of her property.

"That the names and residences of the next of kin of said Eliza North, and other persons interested in said estate, are as follows: John D. North, Jackson, Michigan; Elmira P. Howe, Pittsfield, Washtenaw county; Mary E. Baker, Polo, Illinois; Hannah E. Gibson, Kansas City, Missouri,— sons and daughters of said incompetent person," etc.

Petitioner then prays that a day be fixed for the hearing of said petition; that notice be given to all persons interested, requiring them to appear and show cause why a guardian should not be appointed; and prays the appointment of Leonard Gruner as such guardian.

Such proceedings were afterwards had in the probate court of said Washtenaw county that, on the eighth day of May, 1886, Leonard Gruner was by said court duly appointed guardian of said Eliza North on condition of his giving bond in the sum of $36,000.

Proceedings were, soon after, commenced in this Court by filing petition for *mandamus* to compel the ' guardian to pay and deliver over the, property and effects of said Eliza North to her, and to vacate and set aside the order of the probate court appointing such guardian, when on the twenty-second day of June, 1886, a stipulation was filed in this Court, signed by the attorneys of the respective parties, upon which an order was duly entered in this Court wholly vacating and setting aside the order of the probate court made on the eighth

day of May, 1886, by which Leonard Gruner was appointed such guardian, and this order was duly certified to said probate court to be made of record of that court.

It also appears that on the eleventh day of February, 1886, the day succeeding the date of the filing of the opinion by this Court in the case of *North v. Joslin*, plaintiff commenced this suit in the Washtenaw circuit court by summons, and filed her affidavit in the cause for writ of garnishment against Leonard Gruner, in which affidavit it is alleged that defendant Eliza North was indebted to plaintiff in the sum of $3,349, and that Leonard Gruner had property, money, goods, chattels, credits, and effects in his hands and under his custody and control belonging to said Eliza North. Upon this affidavit being filed, a writ of garnishment was duly issued and served upon said Leonard Gruner, who had, up to February 10, 1886, when removed by this Court, pretended to be acting as the guardian of Mrs. North upon the petition of the plaintiff in this case, and who had received and taken into his possession all the property and effects of his ward, and wrongfully continued to hold the same under proceedings commenced by plaintiff in said probate court by her again filing petition for the appointment of guardian of Mrs. North after the opinion was filed in the case of *North v. Joslin*.

The garnishee made his disclosure in writing, and filed the same in said court on March 22, 1886, showing a large amount —several thousand dollars—of personal property in his hands belonging to Mrs. North.

On the twenty-first day of June, 1886, and on the day before the order was made in this Court, under stipulation of the respective parties, setting aside and vacating the order appointing Leonard Gruner guardian made by the probate court above referred to, the plaintiff, in continuation of this present suit, sued out of said circuit court a writ of attachment, and alleged in her affidavit upon which such writ issued, that defendant was a non-resident of this State, and

had not resided in the State of Michigan for three months immediately preceding the time of making this affidavit. This writ of attachment was levied upon the Pittsfield farm. The present cause came on for trial in the circuit court for Washtenaw county at the May term, 1887.

Upon the trial of the cause, plaintiff, being called as a witness in her own behalf, was asked upon her cross-examination if she made a certain affidavit which appeared in the printed record in the case of *North v. Joslin.* She was shown the original affidavit, and admitted that it was her signature, and the affidavit was sworn to by her. This affidavit sets out the claim she then made in reference to this unfortunate family controversy as follows:

"This deponent further states that she is the daughter of the said Eliza North; that said Eliza North is not a business woman, and never was; that she never did or controlled any business; that she does not now, nor ever did, have any knowledge of or experience in business; that she is eighty-four years of age, and wholly incompetent either to take care of herself or her property, or any portion thereof; that for some time she has not been able to be trusted with any currency, as she would forget where she had put it, or what she had done with it.

"That all the property of which she is now possessed belonged in truth to the husband of said Eliza North; that he was a man of ample means, possessed of real and personal estate to the amount of about $30,000, and was so possessed at the time of his death, which occurred in May, 1882; that for many years prior to his death he had kept and managed his property in the name of his wife, the said Eliza North, and it was so situated at the time of his death; that previous to his death he had the sole and exclusive management of all his business, and the said Eliza North's knowledge and participation in said business was limited to the mere signing of her name at his request; that after his death the management of the said property devolved wholly upon this deponent and her son, and was by them controlled until the said fourteenth day of June, 1884, when she left as aforesaid for Kansas City. 　*　*　*　*　*　*　*　*　*

"This deponent denies that before said Eliza North left as aforesaid for Kansas City she made any arrangement of

any kind whatsoever with deponent, or any one else, for the care and support of her insane and imbecile son, Charles North, but, on the contrary, left the said Charles North with this deponent without any arrangement or provision for his maintenance whatever, and has never made, or sought to make, any provision for him since.

" This deponent denies that, prior to the time that the said Eliza North and her husband moved onto the farm in Pittsfield, the said Eliza North paid deponent five dollars per week each for their board; on the contrary, this deponent avers that such an arrangement was made between deponent and her father, Lewis North.

" This deponent further states that some seven years ago, when her father, Lewis North, and her mother, Eliza North, moved upon the farm in Pittsfield, said Lewis North entered into an arrangement with deponent whereby each were to furnish one-half of all expenses, and share equally in the proceeds of said farm; but she avers that within two months after their removal the said Lewis North agreed that the plan was impracticable; that he was too feeble to manage even his farm; and told this deponent to assume the entire management of the farm, and all expenses connected therewith, and do the best she could, and that he would compensate her for her labor, and reimburse her for her expenditures; and thereafter this deponent managed said farm, took the entire care of her old and feeble father, of her mother, and of her insane and inbecile brother, and got along well until her sister, Hannah E. Gibson, appeared in June, 1884,   * · * *   and took her mother home with her to Kansas City," etc.

It appears that this affidavit was made in answer to the affidavit of Eliza North, upon which the *certiorari* was issued in the case of *North v. Joslin,* and, though not considered by this Court in that case, it is now made, by the cross-examination of the plaintiff, a part of the record in this, so far as it may show the position then taken by plaintiff in reference to any contract which plaintiff now claims to have made with the defendant, and which contract, as now claimed, is the basis of the present action.

The declaration filed in the case is upon the common counts in *assumpsit.*

A bill of particulars was subsequently filed in the case by the plaintiff, as follows:

" For the board, care, lodging, and maintenance of
Eliza North, Lewis North, and Charles North, from
February 15, 1876, until May 17, 1882, being six
years and three months, at $20 per week _____ $6,480.00
For board, care, and maintenance of Eliza North and
Charles North, from May 17, 1882, until May 17,
1884, at $15 per week_____ 1,560.00
                                                    _____
                                                    $8,040.00"

The balance of the bill of particulars, $538.50, is made up of items for building and repairs on the buildings on the farm, and for building fence, and other repairs on the farm.

The plaintiff's claim for recovery in this action upon the first two items of her bill of particulars is upon an express agreement made by Eliza North to pay for the board of herself, her husband, and imbecile son, at five dollars per week each, from February 15, 1876, to May 17, 1882, and upon express and implied contract for the payment of her board and care, and that of her imbecile son, from May 17, 1882, the date of the death of her husband, the father of plaintiff, to May 17, 1884, the date when defendant went to live with her daughter, Mrs. Gibson, at Kansas City, Missouri; and plaintiff seeks to recover upon this last item what such board and care is reasonably worth; and she gives testimony in her own behalf to establish her claim.

She says that soon after moving onto the Pittsfield farm her father failed in mind and body, and was unable to look after the care of the farm, and became a great burden to her; that her mother was feeble, and her care fell upon the plaintiff, which, together with the care of the insane and imbecile son, cast upon her a great burden, so that she became broken in health; that at times the son was a raving maniac, sometimes a week at a time, and they were compelled to lock him in his room; and that her mother told her after

the son got bad she should have more pay, and that it was worth $1,000 per year.

That it was worth $10 per week to care for her father during the last two years of his life, and that the rental of the farm was worth not to exceed $150 per year for the one-half; that her mother became lame with the rheumatism so that she was compelled to walk with a cane, and that it was worth $10 per week to care for her.

On her cross-examination, the witness testified that, when the farm was bought, her mother paid $7,000, and plaintiff paid $5,000, for it, and upon further cross-examination the witness testified:

" *Q.* When do you claim there was any contract made between you and Eliza North for the support of Charles? When do you claim the last contract was made between you and Eliza North for the support of Charles?

" *A.* About four weeks after we went onto the Pittsfield farm.

" *Q.* Has that contract ever been changed?

" *A.* Why, she failed to pay anything after she left.

" *Q.* Have you ever had any other agreement with Mrs. North about it since that time, about four weeks after you went onto the farm?

" *A.* Not with her personally; no.

" *Q.* Have you ever had any understanding with Mrs. North, through her husband or herself?—the guardians are out of the question.

" *A.* No, sir.

" *Q.* Then the only and the last contract you ever had with Mrs. North was that you were to support Charles, and that she was to pay what it was worth to support him?

" *A.* Yes, sir.

" *Q.* And that was about four weeks after you went onto the Pittsfield farm?

" *A.* Yes, sir.

" *Q.* Has there ever been any change between you and Mrs. North made in that contract made about four weeks after you went onto the Pittsfield farm?

" *A.* No, sir."

The witness' attention was then called by defendant's

counsel to the affidavit made by her in *North v. Joslin,* and testified in relation thereto as hereinbefore stated. The testimony so given by plaintiff was largely denied and contra-dicted by defendant, who claimed that no such contract or agreement as claimed by plaintiff was ever made or entered into between herself and plaintiff.

A great number of witnesses were examined in the case, and a great amount of testimony was taken, and returned here in the record, and 89 errors are assigned. From the view we take of the case, however, we need discuss but few of them.

At the close of the testimony the court charged the jury as follows:

"I have a note from Mr. Sawyer, in which he notifies me that he does not wish to argue this case; so I say, if you find from the evidence that defendant agreed to pay plaintiff for the board, care, and maintenance of Charles North, Lewis North, and herself at the rate of $5.00 each per week, while they remained at Ann Arbor, from February 15, 1876, to February 1, 1878, then plaintiff will be entitled to recover the same in this action, less any payment plaintiff may have received.

"If you find from the evidence that after the parties moved upon the Pittsfield farm it was agreed between defendant and plaintiff that the plaintiff should account to defendant for one-half of the rental of said farm, and that defendant should pay for the board of herself and son, Charles North, and her husband, Lewis North, the same that she had paid while in Ann Arbor, then plaintiff is entitled to recover in this action for such board, less any payments that may have been made, and less what the jury shall find was a fair rental for the one-half of said farm.

"If you find from the evidence that, when Charles North became worse, defendant promised the plaintiff should be liberally paid for her care and devotion to the said Charles North, then the plaintiff is further entitled to recover in this action a full and just compensation for her care and mainte-nance of the said Charles North, and you may allow her what you believe to be just and right.

"The defendant is liable for all legal contracts, whether made by herself or her duly-authorized agent, and in the case

of those contracts or agreements alleged to have been made with plaintiff, if they were made by her husband with her full knowledge and assent and approval, and in her behalf, she is just as liable thereon as if she was the immediate and direct party to the contract.

" And I state to you there is no matter about the relationship between these parties. You are to treat them exactly as if they had no relationship to each other whatever. The real question is, what was the agreement or arrangement between plaintiff and defendant as to board of herself and Charles and her husband? No matter what the defendant had given to the plaintiff before 1870; no matter what has been done in the probate court, the circuit court, or in the Supreme Court, growing out of the appointment of the guardian for the defendant in this suit;—the only question for you to determine is, what has been the relation—the business relation— of these parties, one with the other? What has the plaintiff done for the defendant, and what is a just and reasonable compensation for the services which she has rendered, over the payment which she has received?

"You will take this case into the jury-room, gentlemen, like 12 honest, intelligent men, consider it, scan it, and do just what your conscience and the evidence in the case dictate you ought to do."

In the third clause of the charge the court directed:

" Then the plaintiff is further entitled to recover in this action a full and just compensation for her care and maintenance of said Charles North, and you may allow her what you believe to be just and right."

Under this charge the jury returned a verdict in favor of plaintiff for $4,000, and defendant brings error.

This was not a correct statement of the measure of damages for breach of contract. It is not for the jury to fix damages for the breach of contract at what they believe to be just and right, and the law leaves no such arbitrary discretion to them. Upon breach of a contract, the damages should be such as fairly and reasonably arise therefrom, or such as may reasonably be supposed to have been in the contemplation of both parties at the time the contract was made,

as the probable result of the breach of it. *Aultman v. Stout,* 15 Neb. 586 (19 N. W. Rep. 464).

A more serious question, however, arises upon the contract as attempted to be proved by plaintiff. The plaintiff sets up on this trial a very different claim than she made by the affidavit to which her attention was called upon her cross-examination. Nowhere does she make in it a claim of any contract with her mother, the defendant in this suit. This affidavit was made at a time when proceedings were pending to appoint a guardian over her mother as an incompetent person, and the affidavit was made to show the court that the defendant was not competent to do any kind of business or manage the estate, nor ever had been; and that whatever the plaintiff had done in reference to the support of Lewis North, his wife, and their insane and imbecile son, was under an express contract with her father, Lewis North, in which her mother took no part.

Failing, however, in getting the guardian appointed, and thus tying up the estate, and preventing her mother having the care and control and disposition of it, this action is brought, and it became necessary then to change front.

The father, Lewis North, was dead, the estate was in Eliza North, and now a claim is made in this case of an express contract with Eliza North for the board, care, lodging, and maintenance of herself, Lewis North, and Charles North from February 15, 1876, to May 17, 1882, the date of the death of the father, and also a claim is made upon express and implied contract for the board, care, and maintenance of Eliza North and Charles North from May 17, 1882, to June 14, 1884, the time when Eliza North went to Kansas City.

In speaking of the first contract,—the one claimed to have been made when the defendant first went with her husband and son to Ann Arbor to live with the plaintiff,—the plaintiff, on examination by her own counsel, says:

" *Q.* Did you have a contract for $15 per week?
" *A.* Yes.
" *Q.* Who made the contract?
" *A.* My father and mother.
" *Q.* Who did you make the contract with?
" *A.* Mr. and Mrs. North. * * *
" *Q.* Why do you say 'father and mother?'
" *A.* Well, father did most of the business and talking.
" *Q.* With whom did you make the contract?
" *A.* With mother."

Witness' attention being further called to the contract or arrangement relative to the farm and the board of defendant, her husband, and Charles, she says this arrangement was made with her mother, though her father did most of the talking, and that the arrangement then made about four weeks after they went onto the Pittsfield farm has never been changed, and that that was the last contract she ever had with defendant in relation to the matter.

If the contract under which plaintiff now claims was one which could be upheld and enforced in the law, it would have been a question for the jury, under proper instructions from the court, how much weight should be given the testimony of plaintiff under the circumstances here stated. But the contract upon which the plaintiff now seeks to recover in this case cannot be enforced against the defendant, and no recovery can be had by the plaintiff upon her own theory of the case for the board of her father, mother, and Charles, during the life-time of the father, the husband of the defendant; nor can the plaintiff recover for the board of Charles after the death of her father, as no contract or agreement is shown with defendant after four weeks from the time the parties moved upon the Pittsfield farm, which was during the life-time of defendant's husband; nor can the plaintiff recover in this case for the board of the defendant, herself, from the death of her husband to the time of her going to Kansas City, without showing some express agreement to have pay therefor, by reason of the relationship

between the parties, as the law would imply no such agreement. The defendant was a married woman, and had no general power to make contracts.

It is true that under our statute a married woman residing with her husband is held liable for merchandise purchased by herself upon her individual credit and sole agreement to pay, even when the merchandise so purchased belongs to the class of family necessaries, and are actually used by the husband's family, and in his house. *Campbell v. White,* 22 Mich. 178. And a wife may also render herself and her estate liable for household goods bought by her and used by the family. *Tillman v. Shackleton,* 15 Mich. 447. This is, however, where there has been an actual purchase of property the title of which passed to the wife, and became a part of her separate estate, and the character of the property purchased, and the use to which it was afterwards put, in no way changed the fact that the contract when made related to her separate property.

But the contract upon which the plaintiff seeks to recover in this case is not a contract of purchase of property. It in no manner related to her sole property. The husband was bound to provide for his wife and family. This duty the law cast upon him. The defendant was a married woman, and she had not the power to make an executory contract not directly connected with her property or estate.

"There was never any impediment to the acquisition of property through purchase by a married woman; the difficulty was that at the common law the ownership passed immediately to the husband by virtue of the marriage relation." *Tillman v. Shackleton,* 15 Mich. 456.

Our statute has not removed all the common-law disabilities of a married woman. It has not made her *sui juris,* or conferred upon her the powers of a *feme sole,* except in certain directions. It has only provided that her real and personal estate acquired before marriage, and all property

real and personal to which she may afterwards become entitled in any manner, shall be and remain her estate, and shall not be liable for the debts, obligations, and engagements of her husband, and may be contracted, sold, transferred, mortgaged, conveyed, devised, or bequeathed by her as if she were unmarried, and she may sue and be sued *in relation to her sole property* as if she were unmarried. How. Stat. §§ 6295, 6297. In all other respects she is a *feme covert*, and subject to all the restraints and disabilities consequent upon that relation.    The husband is still liable for the support of his wife as at the common law. *Berger v. Jacobs*, 21 Mich. 215; *Hyatt v. Adams*, 16 Id. 180.

Even if the defendant contracted with the plaintiff for the board of her husband, son, and herself, with the understanding she was making a personal contract which would be binding upon her and her estate, she simply became responsible for the debt and default of another, and occupied the position of surety for her husband, and such a contract she had not the power to make.    *Russel v. Bank*, 39 Mich. 671; *Gantz v. Toles*, 40 Id. 725; *Jenne v. Marble*, 37 Id. 319.

Another difficulty also arises under the proofs which plaintiff attempts to make of the contract. Plaintiff herself testifies that the conversation was had with her father, and again she says with her father and mother, and that they agreed to pay her five dollars a week each; that about four weeks after they moved onto the Pittsfield farm the last arrangement was made; and that her father did most of the talking, but they were both together when it was made; and no change had been made in that, and she had no other or different arrangement or agreement with her mother after that time, except her mother at one time said after Charles had got bad she should have more pay,—it was worth $1,000 a year.

We do not see how this can be construed as a personal contract with defendant.    The testimony tended to show the contract or agreement for board of defendant and her hus-

band and son, if any was made, was with the husband, rather than with defendant, and no proof is made of any agreement, arrangement, or understanding between plaintiff and defendant after the time above referred to.

The second item in plaintiff's bill of particulars contains a claim for the board of Mrs. North from the date of the death of her husband to the time of her going to Kansas City. It appears that Mrs. North declared at different times the plaintiff should be well paid for her care. While there was no bargain or understanding that she was to pay any certain amount after the death of her husband, the circumstances surrounding the case, and the manner in which the parties lived together, and the arrangement in reference to the management of the farm, seem to imply that Mrs. North was to pay something from her own estate after the death of her husband for her own board and care; and while she could not be charged with the board of Charles even after the death of her husband without some express contract to pay therefor, made after the death of her husband, and could not be charged with the board of herself and her husband and Charles while her husband lived, yet, from the circumstances shown, the jury might find that in any settlement of the matters between the parties which might be had for rent of the farm, and other items of account, an understanding was had for the payment of defendant's board during such time. *O'Connor v. Beckwith*, 41 Mich. 657 (3 N. W. Rep. 166).

The other items of the account—for improvement of the buildings, and the erection of buildings on the farm, building fences, and repairs—were matters for the consideration of the jury, under proper instructions from the court, as they all related to the separate property of the defendant; and this part of the case should have been submitted for their consideration, together with proper items of the account of defendant's set-off, the value of the rental of one-half of the farm, and items for moneys claimed to have been paid by

defendant, as well as the matter of the board of Mrs. North from the time of the death of her husband to the time of her going to Kansas City.

For the errors mentioned the case must be reversed, with costs to defendant, and a new trial ordered.

SHERWOOD, C. J., MORSE and CAMPBELL, JJ., concurred. CHAMPLIN, J., did not sit.