McCONNELL *v.* UNITED STATES EXPRESS CO.

1. CARRIERS—CONTRACTS—EXPRESS COMPANIES—SPECIAL DAMAGES.
   In an action for failure to deliver a trunk, as agreed by the defendant's express agent, evidence that plaintiff informed him she was about to start for New York and intended to embark for Europe in a certain steamship, which would sail at noon on the fifth day thereafter, and was to join a personally conducted tour, that plaintiff had no baggage except the contents of the trunk; the agent assuring her if it was sent at a time specified it would be delivered in time, *held*, to present a question of fact whether the agent had notice of the purpose and of the special damage likely to be suffered as a result of the breach, also, whether there was an agreement to deliver at the time and place named by plaintiff in her testimony.

2. DAMAGES—EXCESSIVE AMOUNT—NEW TRIAL.
   *Held*, also, that, under the evidence, a verdict of $558 need not be set aside as excessive.

3. DAMAGES—CONTRACTS—SPECIAL LOSS OR INJURY.
   Where special circumstances have been communicated to a party at the time of making a contract, so it is apparent that a breach will result in special damages, they are recoverable, although they would not result ordinarily from failure to perform.

4. SAME—MENTAL SUFFERING—BREACH OF CONTRACT.

As damages suffered because of defendant's failure to deliver plaintiff's trunk, in pursuance of the terms of the contract of carriage, she was entitled to recover for the mental as well as physical suffering, discomfort and inconvenience that resulted to her directly because of the alleged breach, if defendant was found to have had notice of the special circumstances.

McALVAY, C. J., and BROOKE, STONE, and OSTRANDER, JJ., dissenting on the ground that damages for mental suffering were not recoverable.

Error to Oakland; Smith, J. Submitted November 10, 1913. (Docket No. 8.) Decided March 27, 1914.

Assumpsit by Isadore N. McConnell against the United States Express Company for breach of a contract of carriage. Judgment for plaintiff, and defendant brings error. Affirmed.

*Walker & Spalding (I. T. Cowles,* of counsel), for appellant.

*Perry & Lynch,* for appellee.

MOORE, J. This case was commenced by declaration which, stripped of its legal verbiage, states in substance: That in July, 1910, the plaintiff, planned through Cook & Son a tour from the city of New York to Italy and other parts of Europe and return by way of England to the city of New York, and had secured her tickets for transportation from New York to Naples by the Cunarder steamer Carpathia, which ship was to leave Pier 54-56, New York, on Thursday, July 7, 1910, at noon, and for return transportation from the city of Liverpool, on the steamer Tunisian of the Allen line, due to sail from Liverpool on said return trip at a certain date. That she had arranged to take with her on said ship her trunk, with its contents, consisting of her wardrobe, steamer rugs, wraps, and all things necessary or convenient for her

tour. That defendant undertook to deliver her trunk at the pier in time for the sailing of the ship. That she took with her from Pontiac, where she began her journey, a small traveling bag in which she had placed only such things as she would imperatively need in going to said boat from Pontiac, and staying over night on the night before the sailing of the ship, and only took with her to such ship such clothing as she absolutely needed to wear on her way to the ship, which clothing was of the plainest kind, and not suitable to wear on shipboard or on said tour. That the party going on said tour was made up of well and fashionably dressed ladies and gentlemen. That plaintiff is a refined woman who has a great taste for dress and for social intercourse, functions, and enjoyments, and for many years prior to said trip had been accustomed to travel, and to dress fashionably and well, and to take part in social functions, pleasures, and enjoyments whenever opportunity was offered therefor, and she planned for and engaged for said tour principally for the social diversion, recreation, and pleasure which said tour and the functions and social entertainments incident thereto would ordinarily give her, particularly while on shipboard. That to that end, and to forward such aim and purpose, she had purchased, at great expense, and so placed in said trunk, a fashionable wardrobe and a large amount of clothing suitable for such a tour, and steamer rugs, wraps, clothing, and other things necessary for her comfort and convenience while on shipboard and elsewhere on said tour, and many other articles that were of great personal value to her, which things in said trunk were worth over $1,000. That the trunk did not arrive at the pier in time, and that she had to sail without it, and was obliged to forego all the social functions, entertainments, and gatherings on said trip, and, because of her want of

such necessary clothing, she was compelled to remain in her stateroom during said trip to Naples, and lost all the benefit, pleasure, and advantage of said trip to Naples. That at the time she was in delicate health, and of a proud, refined, and sensitive disposition and of a nervous temperament, and, because of being deprived of her trunk and contents, she was made unhappy, and disappointed, and discontented, and suffered great humiliation, mortification, chagrin, and worry, disappointment and unhappiness, and was rendered miserable, and her trip was made an utter failure, and she rendered miserable, and constantly worried from the great fear that the trunk and its contents, including said keepsakes which were precious to her, might be lost to her. and her health was undermined.

The defendant pleaded the general issue, and gave notice that it would show that when the trunk was received it gave a written receipt. which was accepted by the plaintiff, in which the liability of the defendant was limited to $50.

After the testimony was all in, the defendant requested a directed verdict. This was refused. At the request of the defendant the trial judge submitted to the jury two special questions:

"(1) Did defendant's driver, Roy Farley, give plaintiff a receipt when he took the trunk at her rooms?

"(2) Did defendant's agent, Burgis, guarantee that the trunk would reach New York on or before noon of July 7, 1910?"

The jury answered the first question in the negative, and the second in the affirmative, and returned a verdict for the plaintiff for $558. Judgment was duly entered for that amount. A motion was made for a new trial, in overruling which the trial judge said the verdict was not against the weight of the evi-

dence, nor was it excessive. The case is brought here by writ of error.

We quote from appellant's brief:

"The following questions arise upon the present record:

"(1) Whether there was any evidence to go to the jury of an agreement on the part of the defendant to deliver plaintiff's trunk before noon of July 7, 1910, and whether the finding of the jury that there was such an agreement was not unsupported by the evidence.

"(2) Whether the damages alleged to have been suffered by the plaintiff were the proximate result of the alleged breach of contract.

"(3) Whether the plaintiff is entitled to special damages caused by her being deprived of the contents of her trunk, in the absence of any showing that the special circumstances giving rise to such damages were brought to the notice of the defendant at the time the defendant made the alleged agreement.

"(4) Whether the plaintiff is entitled to damages for disappointment, worry, and mental suffering.

"(5) Whether the instruction of the court that the jury might take into consideration any interest which the witnesses for the defendant might be shown to have in the result of the suit was not prejudicial to the defendant, in the absence of any evidence tending to show such interest.

"(6) Whether the verdict is not excessive."

These questions are so interwoven that we shall not attempt to discuss them separately.

Mrs. McConnell was sworn as a witness. Her testimony indicated: She had lived in Pontiac 38 years. That she was the widow of Parke McConnell, who was the son of Willard McConnell. That her husband was a merchant in Pontiac some years. That she went to the defendant company's office in Pontiac and told the agent she was going abroad, that she was to sail on the Cunard steamer Carpathia from Pier 54-56, New York, on Thursday, July 7th, at noon, and wanted his company to get her trunk there, and that she

wanted to get of him traveler's checks amounting to $500; that she wanted her trunk in New York early. That the agent said that because of the Fourth of July he could not send it on Sunday or Monday, and that it would go Tuesday at about 11 o'clock. That she asked him if it could not go earlier, and he said it could go at half past 6 o'clock in the morning, but it must be ready at 6 o'clock, and she replied it would be ready; and he said it will only lie at the pier. That she replied, "Even so, I would rather it would do that;" if it did not get there, she would be "undone, as I had nothing besides;" and he said it was ample time. That they came after the trunk at 6 o'clock, and it was delivered to them, and that she never saw it again until about four weeks after her return to Pontiac. She testified she told the agent the name of the steamer she was to sail upon, the time it was to sail, and from what pier. That she joined a personally conducted touring party of upwards of 40 members, and that she paid $482 for her ticket from New York back to New York. She described in detail the clothing that went into the trunk, indicating an ample supply of gowns, waists, negligee, hosiery, underwear, and other articles suitable to be worn by a well-dressed woman off on an extended holiday. In the trunk also were a steamer rug and cap, veils, fans, umbrellas, a lace neck piece which cost $150, and a good long steamer coat. She testified it was difficult to say the total value, but that it would be $500 or more. She testified: That she was accustomed to going in society, to attending public functions, to traveling, and had been abroad before, and knew what to expect on shipboard, and had put into the trunk the articles necessary for her pleasure, comfort, and convenience. That she was then recovering from an attack of nervous prostration. That her cousin met her in New York, and went with her to the pier early to be sure that her trunk would

be put in her stateroom; that they were unable to find it, and that she was obliged to sail without it, as she had made her plans, engaged her passage, and bought her tickets. She testified that, as she was to be in New York but one night, she wore a plain traveling suit, and took no change of clothing with her. That, in addition to what she wore, she had only a nightgown and a few toilet articles which she carried in her handbag. That there were several hundred first-class passengers on board ship, well-dressed, intelligent people, many of whom were going over to the Passion Play.

"*Q.* State what inconvenience and discomfort, if any, you suffered because of not having those things in your trunk.

"*A.* Well, I was cold, and I had to stay in my stateroom a good share of the time when I required out doors air, and wished it, and I could not attend the services and society and entertainments. * * *

"*Q.* You say you have traveled before; now state whether or not there were the ordinary entertainments on shipboard on that trip over there.

"*A.* Yes, sir; there was. There were concerts, cards, dancing, games of all sorts, and social visiting. I was not able to take part in those events because of not being able to make a fairly respectable appearance; neither as to receiving persons who wanted to be introduced.

"*Q.* State what loss on account of your not having the contents of your trunk on your way over there— state what your loss was.

"*A.* I lost all pleasure on my trip.

"*Mr. Hofelich:* I object to it, and ask that the answer be stricken out. (Objection overruled, and answer allowed to stand. Exception duly taken by defendant.)

"*A.* And it certainly was an injury to my health and an annoyance, and the captain came to me and talked to me, because he knew I was having such a miserable time.

"*Q.* State whether you did suffer on account of that annoyance.

"*A.* I did, certainly, in every way.

"*Q.* You say it affected your health; now to what extent?

"*A.* I can't tell [witness crying].

"*Q.* State what the effect was upon your mind on account of the anxiety that you mention, as to whether you would ever get your trunk or not.

"*A.* Well, they cabled me it would be sent.

"*Q.* But what was the effect on your mind?

"*Mr. Hofelich:* I object to it.

"*A.* It was distressing, and kept me ill."

So far the testimony was brought out on direct examination. The cross-examination brought out many details:

"*Q.* Now, Mrs. McConnell, would you have used all of these articles in your trunk that you have mentioned in your direct examination while you were on shipboard?

"*A.* Why, I didn't intend to; but I expected to use them. I would probably have used all of those articles, various dresses, and suits, and everything. I knew I would require more. I did other times when traveling.

"*Q.* Did you say anything to Mr. Burgis respecting the state of your health at that time?

"*A.* Well, I don't know that I did; but every one in town knew that I was ill and had nervous—

"*Q.* But there was nothing expressly said to him about it?

"*A.* No, sir; I left Pontiac about 11 o'clock that same day. I had very few things to look after, and had no other matters to attend to at the time the teamster called for my trunk. I had everything attended to before I started. I am somewhat nervous; but I remember distinctly that the driver did not give me a receipt. At the time this trunk was taken up the driver did not ask me a word about the value of the trunk. He never offered me a receipt in my room. I have a distinct recollection that there was none given when I went down to pay for the sending of the trunk, and I went down to the express office about 10 o'clock, and there was a girl in charge of the office, and there was a little confusion about my making change, and I thought when I paid for my trunk I would ask for

a receipt, and it was not offered me, and when I came back to the bank I spoke—

"*Q.* Just a moment. Do you remember how much you paid for it?

"*A.* I can't exactly tell; but I think it was somewhere near $1.40, or something, but I can't swear to that, for I don't just remember, but that is about what it usually is. I was not seasick at all on the trip across."

The express agent was a witness. The substance of his testimony is:

"I was in their employ in July, 1910, and remember having a conversation with Mrs. McConnell respecting the shipment of her trunk about July 1st. About July 1st she came into the office and spoke to me about sending a trunk, and also about buying checks, and asked me when I thought the trunk ought to go; that is, she told me when the boat was due to leave New York. I told her the trunk could not leave on the 3rd or 4th, as one was Sunday, and the other a holiday, and we had no cars out, and I could not handle it on those days. Then she asked me if, leaving the first thing on the 5th, it ought not to get there, and I no doubt told her it should, and then we made an agreement that she would have the trunk ready at 6 or 6:30 in the morning, and I agreed to have the driver there and pick up the trunk on the morning of the 5th. I made no agreement as to the time the trunk would reach New York. I did not guarantee to get it there by noon of the 7th.

"*Q.* Did she say anything about the contents of the trunk?

"*A.* She did not that I know of.

"*Q.* Did she say anything as to whether that trunk was the only one she would have?

"*A.* I don't think she made any such remark at all.

"*Q.* Did she say that she had packed or would pack her entire wardrobe in that trunk?

"*A.* No; she didn't.

"*Q.* Did she say anything about any inconvenience to which she would be subjected if the trunk did not reach there by that time?

"*A.* I don't remember of her making any remark in regard to that at all."

The cross-examination brought out more in detail that he was informed by Mrs. McConnell that she was going to take a Cook personally conducted tour, the steamer she proposed to sail on, the time when and the place from where it would sail, and that he expected the trunk would get to the pier in time for that steamer, and that Mrs. McConnell bought traveler's checks of him.

Counsel for appellant contend:

"No damages are ever recoverable in actions *ex contractu*, unless they are shown by the party claiming them to be the natural and proximate consequence of the breach complained of. Of course each of the circumstances which concurred with the breach in producing the damage, and without which it would not have happened, is a part of its cause, and if any of these concurring circumstances are so far out of the ordinary course of nature, or of human affairs, that they cannot fairly be presumed to have been contemplated by the parties at the time of making the contract, then the damage is not the natural result of the breach, and is therefore not recoverable"—and cite many cases.

They claim this line of cases ought to control the instant case.

Counsel for plaintiff contend:

"We take the position that special damages can be recovered for breach of a contract made under special circumstances, although they may not be the natural result of an ordinary breach. We call attention to the following cases and authorities illustrative of the principle involved, and what special damages can be regarded as fairly within the contemplation of the parties:

"Page says 'that, where special circumstances have been communicated to a party at the time of the making of the contract, which go to show that its breach will involve special damages, such damages may be recovered, although not the natural result of an ordinary breach.' 3 Page on Contracts, § 1578; 13 Cyc.

p. 34, and note 87. That principle has been fully adopted in Michigan.

"In *Howe* v. *North,* 69 Mich. 281 [37 N. W. 213], this court said: 'Upon breach of a contract, the damages could be such as fairly and reasonably arise therefrom, or such as may reasonably be supposed to have been in the contemplation of both parties at the time the contract was made, as the probable result of the breach of it.'

"We also call attention to the recent case of *Hayes* v. *Railroad Co.* [163 Mich. 174, 128 N. W. 217, 31 L. R. A. (N. S.) 229]. That suit was brought to recover certain special damages claimed to have been sustained by plaintiff on account of the failure of defendant to perform a certain contract of carriage by rail, made and entered into between the plaintiff and the defendant's agent, in Detroit. The plaintiff had urgent business before one of the departments at Washington, which required his presence in that city at a certain time, and, desiring to use the least time possible in making the trip, stated the circumstances to the defendant's agent, and desired to know of him if the defendant company, whose train left Detroit at a certain time, would, without fail, furnish transportation and carry the party from Detroit to arrive at Washington before the required time. It was understood by both parties that the making of a certain connection at Buffalo was essential to make the trip within the time specified. The plaintiff alleged that the defendant guaranteed and agreed to make that connection. The damages which the plaintiff sought to recover were for hiring a special train or car for a portion of the distance. The court, among other things, said:

"'It is contended that the damages recovered are special, and could not have been within the contemplation of the parties at the time of the making of the contract. It appears from the record that defendant's agent was fully and repeatedly informed of the exigency that plaintiff and his attorneys must be in attendance before one of the departments at Washington on July 20th, in the forenoon, on a matter of importance, and the agent so testified. It is true the department and the case were not mentioned. The notice, however, was sufficiently explicit for the purpose of this case.'

"The court refused to reverse the judgment for such special damages. *Hayes* v. *Railroad Co.*, 163 Mich. 174 [128 N. W. 217, 31 L. R. A. (N. S.) 229].

"This court has also held that the depreciation of value of certain wheat was the proximate result of shutting off water from a mill contrary to the provisions of a contract. *Gordon* v. *Hydraulic Co.*, 117 Mich. 620 [76 N. W. 142].

"In a case in this State where an express company neglected to collect of a consignee of goods who was insolvent, it was held that the express company was liable for the amount to be so collected. *Hutchings* v. *Ladd*, 16 Mich. 493.

"This court also held that, in case of a breach of a contract for towing a vessel, the plaintiff could recover for loss of profit on his shipping contract. *Loud* v. *Campbell*, 26 Mich. 239.

"The Supreme Court of Maine also held that, where an express company failed to deliver an insurance premium in time to save the policy, and the policy lapsed, that the company would be liable for the special damages resulting. *Grindle* v. *Express Co.*, 67 Me. 317 (24 Am. Rep. 31).

"The Supreme Court of Massachusetts, under the peculiar circumstances of a particular case, decided that a railway was responsible for the freezing of goods resulting from delayed shipment. *Fox* v. *Railroad Co.*, 148 Mass. 220 (19 N. E. 222, 1 L. R. A. 702).

"In a New York case the plaintiff, having contracted to sell and deliver to a railway company 400 tons of rails, made of iron, with steel caps, contracted with the defendant to furnish the caps; it being informed for what purposes they were wanted. Plaintiff was unable to perform his contract because of the failure of the defendant to furnish the caps. The court decided that the plaintiff was entitled to recover the profits he would have realized, and the fact that the price was not communicated to the defendant did not change the rule of damages. The court, among other things, said:

" 'It is presumed that the parties contemplate the usual and natural consequences of a breach when the contract is made, and if the contract is made with reference to special circum-

stances, fixing or affecting the amount of damages, such special circumstances are regarded within the contemplation of the parties, and damages may be assessed accordingly.' *Booth* v. *Rolling Mill Co.,* 60 N. Y. 487."

The cases support the contention of counsel.

In *Hamilton* v. *Railroad Co.,* 96 N. C. 398 (3 S. E. 164), it was held:

"It is not error in such case to charge the jury that, if a certain day in question was a sale day, and the best sale day, and the shipper wished his cattle to be at their destination on that day, and this was known to the railroad company, and was in view of both parties when the contract was made, the shipper would be entitled to such special damages as actually resulted from the circumstances."

See *Richner* v. *Live Stock Co.,* 44 Colo. 302 (98 Pac. 178).

In *Weston* v. *Railroad,* 190 Mass. 298 (76 N. E. 1050, 4 L. R. A. [N. S.] 569, 112 Am. St. Rep. 330, 5 Am. & Eng. Ann. Cas. 825), the court, among other things, said:

"We assume for the purposes of this decision that this shipping receipt, or at any rate the shipping order and this receipt together, constitute a written contract. But it is always competent to show knowledge by the contracting parties to a written contract of the circumstances on the basis of which it is made, for the purpose of showing what was within the contemplation of the parties in making it. Knowledge of the circumstances which formed the basis on which the contract was made is competent on the question of what damages were in the contemplation of the parties to it, whether a party seeks to recover ordinary or special damages. That has been laid down in all the cases on the subject."

In another Massachusetts case the court decided that, where the purchaser of pipe notifies the seller that, if it is not delivered at once, there is danger of the caving in of the ditch, and the latter agrees to deliver the pipe at once, without notifying the pur-

chaser that he will not be liable in any event for damages to the ditch, it is an implied agreement to assume the special liability which will render the seller liable for damages to the ditch caused by his negligence in failing to deliver the pipe. *Lonergan* v. *Waldo,* 179 Mass. 135 (60 N. E. 479, 88 Am. St. Rep. 365).

See, also, *Pittsburgh, etc., R. Co.* v. *Morton,* 61 Ind. 539 (28 Am. Rep. 682) ; *Hammer* v. *Schoenfelder,* 47 Wis. 455 (2 N. W. 1129) ; 3 Elliott on Contracts, p. 366; 3 Elliott on Contracts, § 2131.

It is very clear, we think, that the defendant knew of the special circumstances making the presence of the trunk necessary, and that special damages would follow if it was not there.

We now approach the question: Can plaintiff recover for such mental as well as physical suffering, discomfort, and inconveniences as resulted to her directly because of the alleged breach of contract? It will be remembered that Mrs. McConnell testified that she suffered from the cold, that her health was injured, and she was made ill.

In 1 Sutherland on Damages (1882 Ed.), p. 156, appears the following:

"May damages for breach of contract include other than pecuniary elements? In actions upon contract, the losses sustained do not, by reason of the nature of the transactions which they involve, embrace, ordinarily, any other than pecuniary elements. There is, however, no reason why other natural and direct injuries might not justify and require compensation. Contracts are not often made for a purpose, the defeating or impairing of which can, in a legal sense, inflict a direct and natural injury to the feelings of the injured party. A breach of promise of marriage is an instance of such a contract, and such considerations enter into the estimate of the damages. The action for such a cause is often referred to as an exceptional action. In a certain sense it is so; but in the particular under consideration, it is only peculiar. It

is an action upon contract, and the damages allowed are such as, considering the nature and benefits of the thing promised, will be an adequate compensation. They being of a personal nature, cannot be wholly measured by a pecuniary standard; the cause of action, for the same reason, does not survive; it dies with the person, as all demands for personal injuries do. They are recoverable by the injured party because they proceed directly and naturally from the breach. Other actions upon contract may embrace like damages. * * *

"While it is true that if the breach causes no actual injury beyond vexation and annoyance, as all breaches of contract do more or less, they are not subjects of compensation, unless to the extent that the contract was made specially to procure exemption from them. To that extent, that is, where a contract is made to secure relief from a particular inconvenience or annoyance, or to confer a particular enjoyment, the breach, so far as it disappoints in respect of that purpose, may give a right to damages appropriate to the objects of the contract."

See *Hayes* v. *Railroad Co.*, 163 Mich. 174 (128 N. W. 217, 31 L. R. A. [N. S.] 229).

In *Wadsworth* v. *Telegraph Co.*, 86 Tenn. 695 (8 S. W. 574, 6 Am. St. Rep. 864), occurs the following:

"There is a large class of actions for tort in which substantial recoveries are authorized and sustained for injury to the feelings of the person suing, when the other damage is nominal merely. As instances of such actions, we mention the case of a husband suing for an injury to his wife, or for seducing or enticing her away from him, and that of a parent suing for the seduction of a daughter. In all these cases the main element of damage, the real injury sustained, is the wound to the feelings—the loss of service upon which the actions are technically based being but a legal fiction, and more imaginary than real. *Love* v. *Masoner*, 6 Baxt. (Tenn.) 27 [32 Am. Rep. 522]; *Parker* v. *Meek*, 3 Sneed (Tenn.), 30; *Maguinay* v. *Saudek*, 5 Sneed (Tenn.), 147; Cooley on Torts, 224, 226, 231; 3 Suth. on Dam. 744."

The writer then quotes what we have quoted from Sutherland, and proceeds:

"These are but illustrations and applications of the general rule, which we have already stated, for the estimation of damages in actions for breach of contract. They serve the purpose of showing that in the ordinary contract only pecuniary benefits are contemplated by the contracting parties, and that therefore the damages resulting from the breach of such a contract must be measured by pecuniary standards; and that where other than pecuniary benefits are contracted for, other than pecuniary standards will be applied in the ascertainment of the damages flowing from the breach.

"The case before us (so far as it is an action for breach of contract) is subject to the same general rule, and the defendant is answerable in damages for the breach according to the nature of the contract, and the character and extent of the injury suffered by reason of its nonperformance.

"The messages were sent for a particular purpose, which was disclosed upon their faces, and of which the defendant had full notice. That purpose was not of a pecuniary nature. There was no offer or instruction to buy or sell anything—no proposition or promise with respect to any business transaction.

"The messages were of far greater importance to the receiver than any of these. Her brother was lying at the point of death in easy reach of her. It was information of this fact that the defendant first undertook to convey to her for a stipulated sum, and which, if conveyed promptly, would have enabled her to be with him in his last moments, and would have saved her the injury of which she complains.

"Then her brother died away from her; his body needed her attention, and would have received it, as averred, if the defendant had done its duty. It was intelligence of the death which the defendant agreed, in the second place, to communicate to her.

"The messages were proper in language, and lawful in purpose. She was entitled to the information they contained, and to whatever benefits that information would have conferred upon her, even though such benefits be mainly or altogether to the feelings and

affections. The defendant contracted that she should have those benefits, and that she should be spared whatever pain and anguish such information, promptly conveyed, would prevent.

"By all the authorities, including our Code, it was the duty of the defendant to transmit and deliver these messages 'correctly and without unreasonable delay,' and in failing to do so it became responsible for all loss or injury occasioned thereby. Code (M. & V.) §§ 1541, 1542; *Marr* v. *Telegraph Co.*, 85 Tenn. 529 (3 S. W. 496); Gray's Com. by Tel. §§ 81, 82, *et seq.*; Cooley on Torts, 646, 647; Wharton on Neg. § 767; 3 Suth. on Dam. 298-300; Sher. & Red. on Neg. § 605.
\* \* \*

"In addition to this, it is but reasonable to presume that such a flagrant breach of plain obligation with respect to matters so near the heart and so accustomed to the respect of all mankind as is here averred, has but seldom occurred, and, therefore, has but seldom been brought to the attention of the courts of the country.

"To hold that the defendant is not liable in this case for the wrong and injury done to the feelings and affections of Mrs. Wadsworth by its default, would be to disregard the purpose of the telegrams altogether, and to violate that rule of law which authorizes a recovery of damages appropriate to the objects of the contract broken; and, furthermore, such a holding would justify the conclusion that the defendant might, with impunity, have refused to receive and transmit such messages at all; and that it has the right in the future to do as it has done in this case, or, at least, that it cannot be required to respond in damages for doing so."

See *Barnes* v. *Telegraph Co.*, 27 Nev. 438 (76 Pac. 931, 65 L. R. A. 666, 103 Am. St. Rep. 776, 1 Am. & Eng. Ann. Cas. 346).

In *Browning* v. *Fies*, 4 Ala. App. 580 (58 South. 931), the following language is used:

"The evidence without conflict showed that the plaintiff, on the day of the evening upon which he was to be married, went to the defendants' place of business in Birmingham, Ala., and entered into a con-

tract with the defendants, who were engaged in conducting a public livery business, to furnish the plaintiff, for the use of himself, friends, and family, a carriage and team which was to be sent to the plaintiff's residence at or near Rising Station at 7:30 o'clock p. m. on that day to carry plaintiff and his wedding party to the church in Birmingham, three miles distant, where the plaintiff was to be married at 8 o'clock on that evening. The defendants made a charge of $5 for the specified use of the carriage and team, which amount was paid to the defendants by the plaintiff, who at the time of making the contract informed the defendants of the purpose for which the same was to be used and the hour appointed for the ceremony, and the defendants agreed and contracted to furnish the carriage and team to be used by the plaintiff for this specific purpose. It was also shown without conflict in the evidence that the defendants made default and breached the contract, and failed to send the carriage at the time and place as they contracted to do, and no excuse whatever was offered upon the part of the defendants for having failed to perform the contract. The plaintiff, on account of the defendants' breach of the contract, was compelled, in order to reach the church where his prospective bride and friends were awaiting his coming, to resort to a public street car in which plaintiff and his family and friends, at the expenditure of 30 cents for street car fare, attended the wedding appareled in 'dress' or 'evening' clothes. The plaintiff and the lady members of his family, unsuitably attired for riding in a street car and for walking along the public streets, had to walk for several squares from the place necessary to leave the car line in going to the church, and the wedding ceremony was delayed for 45 or 50 minutes on account of the failure of the plaintiff to reach the church on time. During this period of delay, the bride, family, minister, and friends in attendance at the church were kept waiting upon the delayed arrival of the prospective groom.

"On the trial the plaintiff offered in varying forms questions to elicit evidence going to show that he suffered mental and physical pain, mortification, and humiliation, but on objection of the defendants he

was not allowed to make such proof or to show any elements of damage of this nature.  *    *    *

"The plaintiff's special or ulterior purpose in making the contract was disclosed at the time it was entered into and thereby became incorporated into it and thus afforded a substantial basis for the assessment of special damages.  The special circumstances having been known and assented to by each of the contracting parties, each is deemed to have contracted with reference to them, and the party who breaches the contract may be justly held to make good to the other whatever damages, general or special, he has sustained which are the reasonable and natural consequences of the breach under the known circumstances with reference to which the parties acted in making the contract.

"When a contract is entered into under special circumstances within the knowledge of both parties, the natural and proximate consequences of a breach of which will entail special damages upon the party not in default, the larger amount of damages may be recovered as having been in the contemplation of both parties.  *Bixby-Theirson Lumber Co.* v. *Evans*, 167 Ala. 431 (52 South. 843, 29 L. R. A. [N. S.] 194, 140 Am. St. Rep. 47).  This was also the English rule and the rule at common law.  Damages recoverable for the breach of a contract are measured, not only by the actual loss sustained that naturally results as the ordinary consequence of the breach, but extend to consequences which may, under the circumstances of entering into the contract, be presumed to have been in the contemplation of both parties as the probable result of a breach.  6 Eng. Rul. Cas. 617.  And, if the special circumstances are communicated, they become an element of the contract.  *Daugherty* v. *Telegraph Co.*, 75 Ala. 168 (51 Am. Rep. 435).

"But are damages for mental suffering an element of the special damages recoverable?

" 'Injury to the feelings—mental harassment—is an element of actual damages. "Wounding a man's feelings is as much an element of actual damages as breaking his limb." *Head* v. *Railway Co.*, 79 Ga. 358 (7 S. E. 217, 11 Am. St. Rep. 434).' *Birmingham Water Works Co.* v. *Martini*, 2 Ala. App. 652 (56 South. 833).

"The right to recover special damages for mental anguish growing out of a breach of contract to send and deliver a telegram, as said in the recent case of *Western Union Telegraph Co.* v. *Cleveland,* 169 Ala. 131, 135 (53 South. 80, 82 [Ann. Cas. 1912B, 534]), 'has been settled in this court'—citing the cases sustaining this proposition.

"If damages for mental suffering are actual damages and recoverable as compensatory damages when proximately resulting from a breach of the contract, because of the nature of a telegram and the relationship disclosed bringing this consequence of the breach within the contemplation of the parties, as was held in *Western Union Telegraph Co.* v. *Haley,* 143 Ala. 586 (39 South. 386), we cannot perceive under what rule or by what sound reason such actual damages can be excluded as a proper measure of recovery in connection with the pecuniary loss sustained    *    *    * as a direct consequence from the infraction of a contract entered into under special circumstances known to both parties, and with reference to which they contracted.    *    *    *

"In this particular case, considering the subject-matter of the contract, the special purpose and exceptional use to which plaintiff intended to put the carriage, which was communicated and well known to the defendants, and with reference to which they contracted, it would seem that it was in the reasonable contemplation of the parties, when the contract was entered into under the special known circumstances, that the immediate effect and proximate result ensuing from a breach of the contract by the defendants would cause the plaintiff inconvenience, annoyance, mental harassment, or distress, and make him to suffer physical delay with the attendant discomfort, as well as mental pain in consequence thereof. Certainly it is but common knowledge that some distress of mind must be the natural and proximate consequence of being delayed and not having proper conveyance to meet an appointment of such delicate nature."

In a Texas case it was held:

"The plaintiff purchased tickets over defendant's road for himself, his wife and two children, and obtained checks for his baggage. The defendant carried

them only a part of the distance, and they were compelled to buy tickets over another road, and reached their destination after several days' delay, where they were detained some time waiting for their baggage. The extra expense incurred was $90. *Held,* that damages for mental suffering were recoverable, and that a verdict for $500 was not excessive." *St. Louis, etc., R. Co.* v. *Berry,* 4 Willson, Civ. Cas. Ct. App. § 166 (15 S. W. 48).

In *Lewis* v. *Holmes,* 109 La. 1030 (34 South. 66, 61 L. R. A. 274), it was said:

"Although the general rule is that damages are the amount of the loss the contractor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain, to the party. When the contract has for its object the gratification of some intellectual enjoyment, whether in religion, morality, or taste, or some convenience or other legal gratification, although these are not appreciated in money by the parties, yet damages are due for their breach. A contract for a religious or charitable foundation, a promise of marriage, or an engagement for a work of some of the fine arts, are objects and examples of this rule. *  *  *
"In computing the damages, the allowance must be restricted to what may reasonably be held to have been within the contemplation of the parties in entering into the contract. The contract was to furnish dresses in time for the wedding on the 19th. D. H. Holmes must be held to have known that, if the dresses were not finished by that day, the bride would be keenly disappointed. Also that the bride would need the dresses for the festivities incident to her wedding and immediately following, for which it is customary for brides to provide themselves with a trousseau.
"In gauging this disappointment of the bride, the surrounding circumstances must, as a matter of course, be considered. And one of these is the fact that entertainments were planned, and that for want of the dresses these entertainments would have to be given up; and another is her humiliation in going to

her husband unprovided with a suitable trousseau. We do not think that the amount of $575, fixed by the district judge, is excessive."

In *Central of Georgia R. Co.* v. *Knight*, 3 Ala. App. 436 (57 South. 253), plaintiff's husband had purchased a ticket for plaintiff from B. by way of S. to N., including transportation by rail to S. and by steamship from S. to N. The agent agreed to telegraph for stateroom accommodations on the boat, which he failed to do. *Held*, that the jury, in determining damages, were properly permitted to take into consideration the fact that, to the knowledge of defendant's agent, the trip was part of plaintiff's bridal trip, and the delay incident to going by way of S., in order to take the trip by water. The court said:

"A woman regards her bridal tour among the important events of her life, and the mental distress and worry she might undergo on such an occasion because of being prevented or delayed in securing stateroom accommodations for a voyage by water on which she had set her heart would no doubt be greater than if the denial or delay and attendant annoyance and disappointment came to her at some other time, and this was a proper matter for the jury to consider in the imposition of damages for mental distress and worry under the pleadings and evidence in this case."

The headnote in *Barnes* v. *Telegraph Co.*, 27 Nev. 438 (76 Pac. 931, 65 L. R. A. 666, 103 Am. St. Rep. 776, 1 Am. & Eng. Ann. Cas. 346), reads:

"Where, by reason of a telegraph company's failure to deliver a message, the sender was placed in a strange city, 400 miles from home, with only $1.25 in his pocket, and in trying to reach home suffered cold and hunger, and mental worry and distress, $400 damages was not excessive."

This statement is justified by the opinion.

In *Aaron* v. *Ward*, 203 N. Y. 351 (96 N. E. 736, 38 L. R. A. [N. S.] 204), occurs the following:

"Cullen, C. J. The defendant was the proprietor of a bathing establishment on the beach at Coney Island. The plaintiff, intending to take a bath in the surf, purchased a ticket from the defendant's employees for the sum of 25 cents, and took her position in a line of the defendant's patrons leading to a window at which the ticket entitled her to receive, upon its surrender, a key admitting her to a bath-house. When she approached the window a dispute arose between her and the defendant's employees as to right of another person not in the line to have a · key given to him in advance of the plaintiff. As a result of this dispute plaintiff was ejected from the defendant's premises, the agents of the latter refusing to furnish her with the accommodations for which she had contracted. It is not necessary to discuss the merits of the dispute, or narrate its details, as the questions of fact involved in that matter have been decided in plaintiff's favor by the municipal court, in which she subsequently brought suit, and that judgment has been unanimously affirmed by the appellate division. The plaintiff was awarded $250 damages against the defendant's contention that she was not entitled to any recovery in excess of the sum paid for the ticket, and the correctness of the defendant's contention is the only question presented on this appeal.

"The action is for a breach of the defendant's contract, and not for a tortious expulsion. It is so denominated in the complaint and was necessarily so brought as the municipal court has no jurisdiction over an action for an assault. It is contended for the defendant that as the action was on contract, the plaintiff was not entitled to any damages for the indignity of her expulsion from the defendant's establishment. It may be admitted that, as a general rule, mental suffering resulting from a breach of contract is not a subject of compensation, but the rule is not universal."

After a full discussion and citation of authorities the judgment was affirmed.

In *Schroeder* v. *Railway Co.*, 174 Mich. 684 (140 N. W. 968), this court, in a case where a female passenger was carried past her destination, and found it necessary to go back over the track in the rain and

darkness, held fright was a proper subject of compensation. We quote from the opinion:

"In 3 Sutherland on Damages (3d Ed.), p. 2774, appears the following:

" 'Damages for Physical and Mental Suffering.—The carrier must make compensation according to the nature of the injury, when the proper action is brought; such injury may consist of personal inconvenience, sickness, loss of time, bodily and mental suffering, loss of capacity to earn money from personal injury, pecuniary expenses, disfigurement, or permanent physical or mental impairment. There is no precise rule by which the extent of recovery for pain and suffering can be measured; but it is well established they are to be compensated when they result from injuries received by the party suing from the wrongful acts or culpable negligence of the defendant. The determination of the amount is committed to the judgment and good sense of jurors, subject to practical revision by the court to correct and relieve from manifest excess; and it is now established that not only bodily pain, but, connected with it, mental suffering—anxiety, suspense, fright, sense of wrong from insult or indignity—may be treated, when the facts will justify it, as an element of the injury for which compensation should be allowed'—citing a large number of cases.

"See, also, 3 Thompson on Negligence (2d Ed.), § 2782; *Pennsylvania Co.* v. *Hoagland,* 78 Ind. 203; *Louisville, etc., R. Co.* v. *Quick,* 125 Ala. 553 (28 South. 14)."

The court declined to set aside a verdict of $425 on the ground that it was excessive. See, also, 12 Mich. Law Rev. p. 232.

It should go without saying that a traveling suit which would be comfortable for a railway journey from Pontiac to New York in hot July weather would not be adequate equipment for a ten days' journey across the middle Atlantic, and that there are no shopping places on the way over.

It is also a matter of common knowledge with those who are familiar with the conditions that there is no certainty of securing a comfortable stateroom upon a

desirable ship in July for a trip across the Atlantic, unless application has been made weeks in advance. It also may be asserted that, for people who are good sailors, one of the chief advantages of the journey is the ability to be comfortably clothed and reclining in an easy chair, or walking about the deck, be able to fill the lungs with ozone, and to feel the tang of the salt sea in the nostrils and throat, and to watch the ever changing procession of the waves, and the clouds, and the wonderful color effects upon the sea and sky. It would add, also, to the enjoyment of a cultivated, normal person to be able to exchange greetings and social amenities with other normal cultivated people, who are sure to be present upon a Cunarder. The pleasure and value of the evenings' entertainments are not to be ignored. It was not a business trip that was planned by Mrs. McConnell, in the expectation that it would bring returns that could be counted in dollars. The results expected were restored health, entertainment, and pleasure, laudable objects for which people are willing to spend time and money, and when attained are usually worth all they cost.

We have, then, the situation of an intelligent woman past middle life, just recovering from an illness, who had planned long in advance an ocean voyage, knowing from previous experience the advantages she might reasonably expect from it, planning in great detail for a wardrobe and other articles which would supply her necessities and provide for her comfort and pleasure, making an expenditure therefor of approximately $500. She had also made a like expenditure for tickets that would enable her to go with a party of congenial people, under favorable conditions, at a good time of the year, upon a desirable ship, and had made a contract with the defendant company which required—— if we simply draw fair inferences from conditions made known to the agent of defendant—that her trunk

should be delivered upon the pier in New York, so as to accompany her. Without fault of hers, and because of the failure of defendant company to carry out its contract, Mrs. McConnell, at the outset of her ocean trip, found her plans all put aside, and herself in a condition where she necessarily was practically a prisoner in her stateroom for ten days, and was deprived of her wardrobe until after her return home. It is not surprising that she should say she was disappointed and ill.

We do not think it can be said, as a matter of law, that there should be no recovery, or that the damages are excessive.

The judgment is affirmed.

Kuhn, Bird, and Steere, JJ., concurred with Moore, J.

Brooke, J. We are of opinion that an improper measure of damages was submitted to the jury. The plaintiff is entitled to recover only for the physical suffering and discomfort occasioned by defendant's breach of contract. Damages to the feelings and mental suffering occasioned by the loss of social enjoyment were not within the contemplation of the parties when the contract was made. The judgment should be reversed, and a new trial granted.

McAlvay, C. J., and Stone and Ostrander, JJ., concurred with Brooke, J.